# EXHIBIT-2

# State of New Hampshire

# Supreme Court

Case No. 2011- 0815                                            Dec 14, 2011

Bedrock Realty Trust, and Samuel Bourne
Individually and as Trustee.

v.

Town of Madison, Cooper Deans and Cargill law firm, Randall F. Cooper in both his personal
and official capacities, Robert King individually, and Robert Babine in his official capacity.

### PLAINTIFF'S OBJECTION TO DEFENDANT'S
### UNTIMELY MOTION FOR SUMMARY DISMISSAL

Now Comes the Plaintiff's Bedrock Realty Trust and Samuel Bourne individually and as trustee,

and hereby Object to the Defendants untimely motion, and the Plaintiffs states as follows:

Procedural history

1.      This Court has only docketed this case, and as of Dec 5, 2011 this Court instructed the

parties that; "*A court order will be issued regarding further proceedings.*" As such, the

Defendants in bad faith, rushed to dismiss this case before any briefing has even occurred, and/or

before this Court has had a chance to review the merits of [new] evidence of the Defendant's

continued abusive actions against Mr. Bourne. As such, the Defendant's untimely motion should

be stricken. This typical and bad faith behavior by these same Defendants demonstrates their

strategy is always to dismiss the case before Mr. Bourne is granted any redress or relief.

Therefore, depriving Mr. Bourne of his Due Process Rights, and provoking further litigation.

1

Statement of Fact

2.      This case addresses the inconstant applications of law, impartial and bias court rulings,

deprivation of due process, continued abusive treatment and deprivation of property rights,

slander of title, title defects, Defendant [King's] defamation, violation of NH Statutes that

requires all towns to follow strict dedication and acceptance laws, and Defendant's efforts to

continually defraud the Plaintiff and this Court by submitting false pleadings and concealing

material facts, clearly demonstrates justice was not served, and now requires further review.

        Do to Defendant's falsified pleadings or perjury, forged maps, concealment of discovery,

and continued abusive behavior, this Court should be very wary of Defendant's counsel Brian

Cullen's false attempt to distract this Court from the actual disputed material facts raised within

the Petition for Original Jurisdiction, which consist of; *"inconstant applications of law, impartial*

*and bias court rulings, deprivation of due process, continued abusive treatment and deprivation*

*of property rights, slander of title, title defects, Defendant [King's] defamation, violation of NH*

*Statutes that requires all towns to follow strict dedication and acceptance laws, and Defendant's*

*efforts to continually defraud the Plaintiff and this Court by submitting false pleadings and*

*concealing material facts. "* As such, the Plaintiffs need not re-address the issues raised in the

Petition for Original Jurisdiction. But instead, the Plaintiff will focus on Defendant[s] continued

abusive tactics now raised by Defendant's untimely motion for summary dismissal.

Continued Slander of Title and harassment

3.      On or about Oct 27, 2011 Defendant King [continues] to promote his private agenda to

re-open the unlawful snowmobile and ATV trail over the subject property, and to further harass

the Plaintiffs, by ignoring the fact that this Court has already confirmed there is no prescriptive

Solomon Harmon Road, there is no public occasion or necessity to layout any such Road, and the

2
.

null and void Kelsey easement does <u>not</u> create a public Highway. NH State case no. (2008-0550 dated May 14, 2009). King's continued abusive behavior is also in spite of Madison Town counsel conceding that Mr. Bourne's property is accessed by a Private Road.  But, persistently in contempt of this Court's earlier ruling, Robert D. King continues to promote unlawful trespass of motorized vehicles, as evident by his most recent Oct 27, 2011 [slander of title] email sent to the town and its conservation committee, (a public document) which completely dismisses this Court's findings and final order of the merits of the consolidated State case originally ruled on by Judge Fitzgerald dated Aug 10, 2007. In King's latest public letter, [slander of title] has occurred again, forcing the Plaintiffs to seek further relief. See King's letter attached hereto as <u>Exhibit 1</u>. (clark realty section has been omitted).

4.      Contrary to King's recent public letter, Town counsel specifically conceded that in fact, Mr. Bourne's property is accessed by a "*Private Road*." See Cooper letter dated Jan 7, 2008 attached hereto as <u>Exhibit 2.</u>

<u>Defendant's continued Fraud on the Court and Bad Faith</u>

5.      Its quite amazing that the Defendants and their counsel Brian Cullen continually deny their continued retaliation against Mr. Bourne, where Defendants have continually interfered with the Plaintiff's reasonable use or access to his property, continually deprived Mr. Bourne of all viable use, as the record reveals quite a disturbing and deceitful track record of Defendant[s] retaliation. For example, Defendants have actually admitted to ordering the Madison Police chief to (cease and desist) <u>all</u> attempts of Mr. Bourne of having access to his property or electrical Utilities. See Clifford Graves, John Arruda, and Larry Martin's testimony, who all admitted to the ordering of, and constant interference, and Defendant Cooper's willful perjury upon this Court denying such collusion, attached hereto as <u>Exhibit 3</u>.

3

The Court should also note that all of the Defendants continued abusive treatment always relates back to instruction[s] by Defendant King. See concealed letter discovered on June 29, 2009 attached hereto as <u>Exhibit 4.</u>

6.     Defendant's latest admission to; *"vowing to deny Bourne his building permit"* at (exhibit 5 petition for original jurisdiction) is specifically concerning, as it confirms Defendants willful intent to [breach their contract] with Mr. Bourne, and that the Defendants previously deceived this Court by falsely claiming the area of the foundation hole was somehow dug or constructed in an unacceptable location still in "current use" therefore, willfully making false claims to this Court that stated; *"the town has no alternative but to revoke your building permit."* See Building inspector Robert Babine's letter of criminal intent as to conspire to falsely revoke Mr. Bourne's permit by stating fabricated excuses demanded by Defendant Brooks, Arruda, and King, attached hereto as <u>Exhibit 5.</u>

And, see also, affidavit of Rod Wood dated July 24, 2008 confirming the Defendants knew they violated the law, and that their intent was in fact, to fabricate building violations as "vowed" by Brooks, Arruda, and King, attached hereto as <u>Exhibit 6.</u>

Exhibit 6 herein, and exhibit 5 attached to the petition for original jurisdiction, both confirm criminal intent by town officials to deprive Mr. Bourne of his property rights, and as such, the <u>ZBA is not the avenue to address criminal intent, breach of contract, fraud, or bad faith of town officials.</u>

This Court and the Superior Court have jurisdiction to address Defendant's breach of contract, retaliation, fraud, and criminal intent to deprive the Plaintiffs of their property rights.

7.     In this Court's previous order dated May 14, 2009 (case no. 2008-0550), this Court in error stated that the Defendants did not act in bad faith, but to the contrary. For example, pre-

4

planning the outcome of an unlawful road layout to circumvent the Court's authority, or
concealing material facts and discovery that demonstrates that the Defendant's blackmailed a
neighbor (Davis) by withholding his permits unless he agreed to petition the town to layout the
disputed road, certainly falls under the concept of bad faith and corrupt practices. This is further
evident by Defendants concealed letters only discovered on June 29, 2009 where they admit to
plan A and plan B "*to pre-empt the Sam Bourne lawsuits...*" and attempt to have Mr. Bourne
arrested on false charges. See Defendant's concealed letter[s] discovered at the Jones deposition
attached hereto as Exhibit 7.

In addition, the Defendant's deceitfully proposed, and specifically used the litigation as
"leverage" to secure rights of the Plaintiffs property for the express benefit of a private
snowmobile and ATV club, where they discovered adverse documentation of *"Kelsey being
adverse to snowmobiles on his property",* but once again, concealing those documents. See
Defendants concealed letter only discovered at the Jones deposition held on June 29, 2009
attached hereto as Exhibit 8.
For further support, Mr. Davis previously testified he "got the idea to lay out the road"  from
Defendant Arruda, and admits that his building permits were first denied, even though he had
road frontage on East Madison road, a Class V publicly maintained highway. See Davis
testimony in part attached hereto as Exhibit 9.

8.     The Defendants also fail to recognize that Judge Houran's bias conduct is further evident
when he allowed his friend Randall Cooper  to be dismissed from the 08-E-0027 case for
willfully committing perjury, willfully submitting forged maps, concealing incriminating
evidence, and specifically falsifying the notary of witness on the Kelsey easement. See Coopers
deposition in part, attached hereto as Exhibit 10.

And, see also Patrick and Patricia Kelsey's affidavit[s] and void easement attached hereto as Exhibit 11.

9.      Ironically, Defendant even attempt to distract this Court by raising issues that arose from Laconia Savings Bank predatory lending practices, and negligence, where they failed to give notice of, or enforcement of a Title policy that specifically covered the Right of Way issues. But instead, Laconia sat idle while Mr. Bourne was subjected to over $400,000.00 in actual damages, originating from the Madison Defendants abusive conduct. See Laconia Savings Bank hidden Title policy that specifically covered the Right of Way issues attached hereto as Exhibit 12.

10.     It should also be noted while the Defendant selectmen continually conspired to retaliate and deprive Mr. Bourne of all reasonable use of his property, club agent Mr. King, Selectman Arruda, Selectman Brooks, and Selectman Shackford, ALL had a direct conflict of interest as life time members of the local snowmobile and ATV club, as such, they all should have disqualified themselves from all decision making do to their conflict of interest, just as required by jury members, and State law. See Defendant Brooks affidavit confirming his conflict of interest, and club radar run results noting Selectman Josh Shackford also having a conflict of interest, attached hereto as Exhibit 13.

King's defamatory emails sent to the general public

11.     In the Plaintiff's petition for original jurisdiction, the Plaintiffs inadvertently did not attach the King defamatory orders by Judge Houran's that were bias and conflict with other recent rulings by this Court. As such, the Plaintiffs now includes herein the [June 11, 2009 and Feb 5, 2010] court orders for further review, which are attached hereto as Exhibit 14.

## In Conclusion

12.    So, after a in-depth review of the; inconstant applications of law, impartial and bias court rulings, conflict of interest, deprivation of due process, continued abusive treatment, retaliation, deprivation of property rights, slander of title, title defects, Defendant [King's] defamation, violation of NH Statutes that requires all towns to follow strict dedication and acceptance laws, and Defendant's efforts to continually defraud the Plaintiff and this Court by submitting false pleadings and concealing material facts, clearly demonstrates justice was not served, and now requires further review.

**Wherefore**, the Plaintiffs respectfully request this Court to:

A.    Deny the Defendant's motion for summary dismissal as untimely, and submitted in bad faith, and

B.    Order the parties to fully brief the issues raised in the petition for original jurisdiction, and

C.    For such other relief that is actually just.

Respectfully Submitted,                              Dec 14, 2011

Bedrock Realty Trust, Samuel Bourne individually,
and as Trustee,
117 Pond St
East Bridgewater MA 02333
508-378-9319

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing has been forwarded via U.S. First Class Mail, postage prepaid, to:

Randall Cooper, Cooper, Deans, and Cargill,
George W. Walker Esq,
Brian J.S. Cullen Esq,
Andrew Ranks Esq, and Thomas Fay Esq,

# EXHIBIT 1

Close Window

| | |
|---|---|
| **From:** | R. D. King <rdkingx2@earthlink.net> |
| **To:** | Madison Conservation Commission <conservation@madison-nh.org> |
| **Cc:** | Melissa Arias, Town Administrator <melissa@madison-nh.org>Selectmen's Office, Madison <office@madison-nh.org>Wendy Huff <wendy7701@hotmail.com> |
| **Subject:** | Town properties being overlooked by the Conservation Commission (Email #1 of 3) |
| **Date:** | 10/27/2011 |
| **Time:** | 2:14 PM |

**Attachments:** A - MINUTES, TM 1998, Article 29 (Dam land giveaway).PDF
B - Settlement Agreement, Dam land giveaway, 14 March 1998.PDF
C - DEED, conservation easement, Lambert to Town, Dam land, 31Aug98.PDF

## TO THE MADISON CONSERVATION COMMISSION:

Looking through your lists of conservation and other Town properties, including the binder on this subject at the Library as well as the listing in your latest draft of a revised Master Plan, I can find no mention of two important Town properties that clearly deserve prominent inclusion in such records. These are (1) the 1998 conservation easement with associated roadway and trails on the property adjoining the Silver Lake Dam belonging to Clark Realty Trust and (2) the 1979 Kelsey right-of-way easement leading from East Madison Road to the McNair conservation and recreation parcel that adjoins Bald Ledge. The deeds that created these properties assigned stewardship responsibilities to the Conservation Commission.

Attachments A through D document the Clark Realty Trust easement and Attachments E through H document the Kelsey easement. These attachments are largely self-explanatory in substantiating what I have stated above.

With respect to the conservation easement and associated roadway and trails on Clark Realty Trust land, there is a history that suggests the need for close supervision of compliance with the restrictions contained in the easement.* If indeed I am correct in assuming that you have essentially "forgotten" this property for a number of years, I urge you to make an inspection of it at an early date. Since the easement was created in 1998, the owner enlarged the main house and remodeled a boathouse into a second dwelling unit, thereby expanding his septic and other needs, possibly at the expense of the easement.

With respect to the Kelsey easement, the 2000 Town Meeting found it necessary to remind the Conservation Commission of its neglected responsibilities toward the McNair conservation/recreation parcel and its associated access route over the right-of-way granted by Kelsey in 1979. See Attachment F. While the Commission responded promptly and appropriately to that directive in 2000, it essentially turned its back on the Kelsey right-of-way when Mr. Bourne commenced his series of lawsuits in 2002, and this neglect continues to this day. Indeed, Commission records include discussions about abandoning the route in favor of an alternative route from a different (and far less convenient) direction. Needless to say, the Commission has no authority to disregard deeded responsibilities, let alone abandon Town property.

Please be reminded that the Kelsey easement was a cherished creation of the Conservation Commission. Members Richard Hocking and Malcolm McNair enthusiastically put up $1500 of their own money to purchase the easement, taking their chances on being reimbursed subsequently by the Town. They must be rolling in their graves at how the present members are treating it now.

Attachment G is the Class VI Roads Committee's report on the status of Solomon Harmon Road, which is simply another name for the course followed by the Kelsey easement. Mr. Bourne contested all of the public's rights to this road,

including the Kelsey easement, the prescriptive public rights to the part of the road ending at Solomon's homestead ruins, and the snowmobile rights that were implied in both the McNair and Kelsey easements. The Town ended up conceding the prescriptive rights and snowmobile rights while stating that the Kelsey easement sufficed to meet its needs, but the challenge to the Kelsey easement was totally defeated.

Attachment H, excerpted from a sworn response to Mr. Bourne's litigation interrogatories, is included to explain the legal status of Solomon Harmon Road and the Kelsey easement that resulted from the Bourne cases. It takes into account and is entirely consistent with all applicable court rulings in those cases.

As you can see from the documentation, the Kelsey easement right-of-way remains intact in its original form, it continues to be viable in serving its originally intended purpose, and it deserves to be prominently included in any lists of Town real estate properties. It also deserves continued stewardship as specified in the easement and as enjoined by the 2000 Town Meeting.

In order to keep email file sizes within acceptable limits, the attachments hereto are being transmitted in three increments. They will appear in three successive emails bearing the same named subject, beginning with Attachments A through C in this message.

The Commission is respectfully requested to take corrective action in fully recognizing the existence of these properties and in faithfully discharging its assigned responsibilities toward them.

Robert D. King

Robert D. King
68 Westview Drive
Madison, NH 03849-5477
Phone/ Fax: (603) 367-4523
Email: RDKingx2@Earthlink.net

**ATTACHMENTS:**

A - MINUTES, Town Meeting 1998, Article 29 (Dam land giveaway)

B - Settlement Agreement, Dam land giveaway, 14 March 1998

C - DEED, conservation easement, Lambert to Town, Dam land, 31Aug98

D - DEED, access road & trails easements, Lambert to Town, dam land, 31Aug98 (signature page omitted)

E - Kelsey R.O.W. Easement, 12Jan79

F - Minutes, Town Meeting 2000, Article 39, declaring importance of McNair Easement & its access road

G - Road Report, Solomon Harmon Road, Class VI Roads Study Committee, 19Nov99

H - Solomon Harmon Road's legal status resulting from court cases

I - Petition for Town injunction against Clark Realty Trust, 15Jul02

* See Attachment I for sample of history.

E

## QUITCLAIM DEED

KNOW ALL MEN BY THESE PRESENTS, that PATRICK M. KELSEY and PATRICIA E. KELSEY of East Madison Road, Town of Madison, County of Carroll, State of New Hampshire. for ONE DOLLAR and other consideration, GRANT TO THE TOWN OF MADISON, a New Hampshire municipal corporation existing pursuant to N.H.R.S.A. 31 et seq., located in the County of Carroll in said State, with QUITCLAIM COVENANTS,

A right of way over land located in Madison, County of Carroll, State of New Hampshire, leading from the southerly side of the Madison-East Madison Road to the northerly side line of property owned by Malcolm P. McNair, Jr., being the northerly side line of Lot 883 in the south division of the survey of the Town of Eaton (then including Madison), prepared by James Hersey in 1782. This conveyance consists of two parts; the first over property owned by the grantors herein, and the second over a right-of-way acquired by the grantors herein, over the property of George A. and Gunilla B. James.

PART ONE. A right of way for those purposes as limited and covenanted below over land located in said Madison, by that land conveyed to said grantors by the Carroll County Trust Company by Quitclaim Deed dated October 19, 1978, and recorded at Book 726, Page 421, Carroll County Registry of Deeds, and bounded and described as follows:

"South by land of Henry Harmon, East by land of Elmer Harmon and the Horace Harmon place so-called, North by land of the heirs of Jonathan Harmon and Harmon Farm, being the same land as deeded to us by Edward E. Hoyt and wife, deed dated April 29, 1909, and recorded in Carroll County Records, Book 139, Page 362."

Said right-of-way shall be a width consistent with the use of logging trucks, with the center line of the same to be the center of the existing old woods roadway as now located and constructed on the face of the earth as it roughly bisects the property above described in a north/south direction, running from a gap in a stone wall on the northerly side line of the property, where the roadway continues on to the property of George A. and Gunilla B. James, a distance of 1800 feet, more or less, to a gap in the stone wall on the northerly side line of land of Malcolm P. McNair, Jr.

The grantee, in consideration of this conveyance, agrees and covenants with the grantors, their heirs and assigns, to restrict the use of the right-of-way granted herein to a use consistent in discharging the responsibilities of the grantee under a Conservation Agreement between said grantee and Malcolm P. McNair, dated December 26, 1976, and recorded at Book 648, Pages 199 and 210, Carroll County Registry of Deeds. Under the terms of said agreement, the grantee, by its Conservation Commission, or its successors, shall use said right-of-way as access to lands encumbered by said Agreement, which said right-of-way currently affords the only practical access. As required by said Agreement, the grantee, by its Conservation Commission, or its successors, will extend to the grantor of said Agreement, or his successors, currently Malcolm P. McNair, Jr., use of said right-of-way in connection with the right reserved in said Agreement; and further, said grantee, by its Conservation Commission, or its successors, will open said right-of-way to public use consistent with said Agreement as restricted for the purposes of:

BOOK 734 PAGE 78


Never
Accepted
By
Town

CARROLL COUNTY REGISTRY

WILLIAM B. PAINE, II
ATTORNEY AT LAW

CARROLL COUNTY REGISTRY OF DEEDS
A TRUE COPY ATTEST:
BOOK 734    PAGE 78
REGISTER

1) Hunting, fishing, and trapping in accordance with the applicable laws and regulations.
2) Biking.
3) Snowshoeing.
4) Cross-country skiing.
5) Horseback riding.
6) Other recreational or sporting uses which the Conservation Commission of the Town of Madison, New Hampshire or its successors, determines to be within the general purposes of the Agreement.

As further required and restricted in said Agreement, the grantee, however, by its Conservation Commission, or its successors, will restrict the use of motor vehicles of any type to the following exceptions only:

a) The use of motor vehicles at any time by fire fighters, personnel of the Fish and Game Department, and law enforcement officers in the course of their duties.
b) The use of motor vehicles by the parties to the Conservation Agreement as restricted and permitted therein.
c) The use of motor vehicles by the grantors herein, and their authorized agents.

PART TWO:   A right-of-way for the same limited purposes as in Part One above, as amended below, over a right-of-way conveyed to the grantors by Quitclaim Deed, dated November 6, 1978, by George A. James, Jr. and Gunilla B. James, recorded at Book 726, Page 422, Carroll County Registry of Deeds, and further bounded and described as follows:

"Commencing at the intersection of this right-of-way on the southerly side of the Madison Road as the latter trends from Madison Corner to East Madison, being a few feet easterly of a concrete bridge over culvert on the Madison Road; thence running southeasterly and thence southerly as said dirt road trends over land of the grantor to its intersection with the northerly sideline of land formerly of Carroll County Trust Company, and concurrently herewith being conveyed by it to the within grantees, and which roadway continues southerly toward the top of Bald Ledge. Said right-of-way shall be thirty (30) feet in width with the center line of the same to be the center line of the existing roadway as now located and constructed on the face of the earth, to the extent the same traverses over land of the grantor."

This conveyance is subject to the provisions of the above-mentioned deed; and the grantee herein, covenants to restrict its use and that of the public to the uses enumerated above, with the exception that any use by George A. James, Jr. and Gunilla B. James, their heirs, successors or assigns, cannot be so restricted.

We, Patrick M. Kelsey and Patricia K. Kelsey, husband and wife, hereby release our rights of homestead and all other interest in and to the above-entitled premises not excepted or reserved in the within conveyance.

WITNESS our hands and seals this _574_ day of _January_ 1979.

Witness:                                LIBER _734_ PAGE _79_

Patrick M. Kelsey

Patricia K. Kelsey

WILLIAM D. PAINE, II
ATTORNEY AT LAW
NORTH CONWAY
NEW HAMPSHIRE 03860

STATE OF NEW HAMPSHIRE
CARROLL, SS.

Personally appeared Patrick M. Kelsey and Patricia K. Kelsey, satisfactorily proven to be the persons whose names are subscribed above, and acknowledged the foregoing instrument to be their free act and dead, this ___5th___ day of ___January___, 1979.

Before me,

_(signature)_
Notary Public
Commission Expires:

## PARTIAL RELEASE OF MORTGAGE

FOR VALUE RECEIVED, the CARROLL COUNTY TRUST COMPANY of Conway, New Hampshire, hereby releases the within-described premises from the operation of a certain mortgage given by Patrick M. and Patricia K. Kelsey, dated October 31, 1978, recorded in Carroll County Registry of Deeds, Book 726, Page 423.

The said mortgage is to otherwise remain in full force and effect.

WITNESS its hand this ___12___ day of ___January___, 1979.

THE CARROLL COUNTY TRUST COMPANY

Witness:

_(signature)_                    By _(signature)_

LIBER 734 PAGE 80

WILLIAM B. PAINE, JR
ATTORNEY AT LAW
NORTH CONWAY
NEW HAMPSHIRE 03860

F

Article 39. To transact any other business that may legally come
before this meeting.

Robert King moved, that the following resolution be adopted:

BE IT RESOLVED:   that because the public receives valuable
recreational benefits from the conservation easement deeded to
the Town by Malcolm P. McNair on December 26, 1976; and because
these benefits are subject to forfeiture if the Town neglects its
obligations under the easement; and because the Conservation
Commission is the Town's agent having responsibility to fulfill
these obligations; accordingly, the Town Meeting hereby requests
that the Conservation Commission give this matter a much higher
and sustained level of attention than has heretofore been given.
In line with this appeal, the Town Meeting requests that an
appropriate sign be erected at or near the entrance of Solomon
Harmon Road proclaiming the covenanted public rights and
restrictions that apply to this unique access route to Bald Ledge
and the hundreds of acres of surrounding McNair Conservation
lands. Seconded by Henry Forrest
SO VOTED

Minutes, TM 2000, p. 17 of Annual Report



## SOLOMON HARMON ROAD

**Description.** Solomon Harmon Road begins on East Madison Road at Roger Cyr's driveway about 0.15 mile south of that road's intersection with Ami Kennett Road. From there it runs southerly 0.4 mile to the ruins of the Solomon Harmon homestead. The ruins consist of an intricate pattern of stone walls such as would be characteristic of old homestead dooryards and barnyards. No cellar hole has been found, although it may underlie the existing cottage that was built on the site at least 30 years ago. The portion of this road that is an old Town road ends here. However, by virtue of deeds granted to the Town by Malcomb P. McNair and Patrick and Patricia Kelsey in 1976 and 1979 respectively, the Class VI right-of-way continues southerly through the remainder of the Solomon Harmon lot and through the McNair lot to the top of Bald Ledge. This final portion of the road has limits on its public use as specified in the deed. Essentially it is limited to foot traffic, bicycles, and small off-road vehicles such as snowmobiles. The purpose of this deeded extension is to provide access to the Conservation Easement Land conveyed to the Town by McNair (CCRD Book 648, Page 199). While the old Town road is two rods wide as was customary for roads of its kind, the extension is specified by deed to be 30 feet wide. The full extent of the McNair land under a public use easement is depicted in CCRD Plan Book 35, Page 47. In the fall of 1999, logging was undertaken on the former Solomon Harmon lot. At the request of the present owners, the logging company (David Welch) realigned the roadbed as it approaches the cottage. The road now swings well to the west of its original bed in that area. By law, Class VI roads may not be so altered without Town authority. This was apparently done unwittingly.

**Origin.** The road to the Solomon Harmon ruins was built in the early 1800s by the homesteader, probably with help from related Harmons living adjacent. Subsequently its maintenance was taken over by the Town. In 1855 Solomon sold out to Ami Kennett, and soon afterwards the road to the unoccupied 50-acre homestead was probably dropped from Town maintenance. The origin of the road beyond the homestead site derives from the McNair and Kelsey deeds cited above. Accordingly, the first 0.4 mile of the road was created by prescription, and the remainder to Bald Ledge was created by recorded deeds of easement. (NOTE: Although the Kelseys also deeded a right-of-way from East Madison Road to the Solomon Harmon ruins, these rights are subordinate to the pre-existing public rights in the old town road located there. Accordingly, the use restrictions imposed in the Kelsey deed do not apply to this section of the road.)

**Tax Map Status.** This road does not appear on the Town Tax Map.

### Summary of Evidence That It Is a Class VI Road

Map support: The only research map on which this road appears is Herbert Weston's "1860" Map of roads and cellar holes.

Written History: Although Herbert Weston included the Solomon Harmon Road and cellar hole on his map, he did not discuss it in his written history.

Status as a Town road was affirmed when in 1848 it was described as a specific part of Highway District 3 (Eaton Town Clerk's Records, p.35). Abner Harmon was its Surveyor of the Highway.

2

Solomon Harmon's 1855 deed to Ami Kennett describes the property as being the "east half of Lot 84 SD, now occupied by Solomon Harmon, containing 50 acres more or less" (Book 28, Page 173 CCRD). "Lot 84 SD" is a reference to James Hersey's 1782 survey map of Eaton (including Madison). This description coincides quite exactly with today's Lot 19 on Tax Map 6, erasing any doubt that this is the right ruins and the right road.

No reference to an access right-of-way can be found in either the 1855 deed to Ami Kennett or the several subsequent deeds in the chain of title until 1978. Significantly, this indicates that all parties in that chain of title (including A. Crosby Kennett and Edward E. Hoyt, among others) recognized that the property was on a Town road, and that a deeded access was therefore unnecessary. It was not until 1978 that the road's origin became so faded from common knowledge that the Kelseys demanded a deeded right-of-way as a condition of purchase from the Carroll County Trust Company. (See Book 726, Pages 421 and 422 CCRD).

This is the only road leading to the Solomon Harmon ruins that bears the earmarks of an old Town road. It follows the most suitable ground directly to the homestead site, is obviously of ancient origin, and is well built. While there are some logging skidways in the general area, none of them show any characteristics of an old Town road and none lead by the most suitable and direct route to the ruins.

The deeded portion of this road from the Solomon Harmon ruins to Bald Ledge was established by the McNair and Kelsey deeds in CCRD Book 648, Book 199 and Book 734, Page 78. Again, this portion of the road has use restrictions.

See affidavits for testimony relating to public rights of travel acquired by prescription.

A page-by-page inspection of the Town Records of Eaton from its beginning through 1852 and of Madison from 1853 onward turned up neither a partial nor complete discontinuance of this road. This means that the public rights of travel as originally established are still in effect.

**Affidavits.** Several affidavits from long term and/or lifelong residents testify as to open and unrestricted public use of this road during the 30-year period preceding 1968 (i.e., 1938 through 1967). Even if records of the origins of this Town road were lost, this testimony could be used to prove that public rights were acquired by prescription during that period. (Note: January 1, 1968 marked the end of the public's power to create highways by prescription.)

**Recommendations:** Place this entire road on the Town Tax Map, including the deeded extension leading to Bald Ledge; give it the name "Solomon Harmon Road;" include it as Class VI on the official Town roads list; depict it on the next revision of the Town Road Map; post it at its entrance as a Class VI Town Road; post it with a notice of deeded use restrictions just south of the Solomon Harmon ruins; and take appropriate legal steps to formalize the road realignment located just north of the Giandria cottage. (NOTE: The definition of a Class VI road is any public road that is not Class I through V. Hence the deeded road south of the Solomon Harmon ruins is technically a Class VI road, even though it has never been in any sense a "town road." To avoid confusion, it is advisable to note on the tax map that it has restrictions, including a prohibition on highway type vehicles.)

*November 18, 1999*

*H*

## KING'S ANSWER TO BOURNE'S COUNTERCLAIM INTERROGATORY #22

**QUESTION:** Please describe your current understanding of the legal status of Solomon Harmon Road.

### ANSWER:

The first part of Solomon Harmon Road runs from its junction with East Madison Road to the southernmost boundary of Mr. Bourne's lot. It coincides with the Kelsey easement. According to my current understanding based on the 1979 Kelsey deed and court orders issued in 2007 and later, the current legal status of this part of Solomon Harmon Road is that of a Class VI road, having been created as such by the 1979 Kelsey deed. Per RSA 229.1, which describes the ways in which highways may be legally created, this part of Solomon Harmon Road is an example of roads "which have been constructed for public travel over land which has been conveyed to a city or town or to the state by deed of a fee or easement interest." Further, the Kelsey easement meets the definition of a Class VI road as set forth in RSA 229.5, in that it is an example of "all other existing public ways" falling outside of the definitions of Classes I through V.

Contrary to a fairly common misconception, the term "Class VI road" is not synonymous with "old town road" or "prescriptive road" and such a road need not have been maintained by the town or state at some earlier time. The distinguishing statutory characteristic of a Class VI road, regardless of its origin, is that the government having jurisdiction over it has no duty to maintain it; also that such government may not spend taxpayer funds to maintain it unless it has been lawfully designated as an emergency lane per RSA 231:59-a.

It is very significant that the Kelsey easement explicitly recognizes that it follows the course of a pre-existing old road that proceeds from its junction at East Madison Road through what is now the Bourne lot to the vicinity of Bald Ledge.

The Kelsey easement restricts the public's use of motorized vehicles but allows the use of such vehicles by loggers, persons on any kind of official government business, and adjoining landowners and their guests. Parties owning private rights to the same roadbed and their visitors/guests may also use motorized vehicles on it, an example being Mr. Bourne himself as well as the Cyr and Davis families.[1] Certain rights to the road are also granted to the McNair family by the Kelsey easement in reference to the McNair Conservation easement. Subject to the discretion of the Madison Conservation Commission, public use of non-motorized vehicles, such as bicycles and animal-drawn vehicles including sleighs and buggies, is not restricted under the Kelsey easement.

After departing the Bourne lot, Solomon Harmon Road continues southward through the McNair parcel to the vicinity of Bald Ledge. The status of this section of the road rests on the general terms of the 1976 McNair conservation easement, which acknowledges Class VI roads on the property and which permits existing roads and trails to continue to exist. There is, however, no specific right-of-way easement to this section of the road. Pertinent to the status of this section of the road, over the years since 1976, the McNair family has never questioned this road's existence and uses, nor has any controversy about it ever come before Madison's Conservation Commission, which has stewardship responsibility for the McNair Easement. As with the northernmost section of Solomon Harmon Road that traverses Cyr and Davis land, Mr. Bourne has no legal standing to challenge the rights of others to use this southernmost section of Solomon Harmon Road.

---

[1] Regarding that portion of Solomon Harmon Road that lies north of the Bourne parcel, the Kelsey easement reserves unrestricted rights to its use by George and Gunilla James and their heirs, successors and assigns. The Cyr's and Davis's are successors-in-title to the James parcel and hence have unrestricted use of the road up to Bourne's northerly boundary. South of that point their rights to the road are the same as the general public's.



# TITLE XX
# TRANSPORTATION
# CHAPTER 229
# HIGHWAY SYSTEM IN THE STATE

## Section 229:1

**229:1 Highways Defined.** – Highways are only such as are laid out in the mode prescribed therefor by statute, or roads which have been constructed for public travel over land which has been conveyed to a city or town or to the state by deed of a fee or easement interest, or roads which have been dedicated to the public use and accepted by the city or town in which such roads are located, or roads which have been used as such for public travel, other than travel to and from a toll bridge or ferry, for 20 years prior to January 1, 1968, and shall include the bridges thereon.

**Source.** RS 53:7. CS 57:7. GS 68:8. GL 74:8. PS 67:1. PL 74:1. RL 90:1. 1943, 57:1. 1945, 188:1, part 1:1. RSA 230:1. 1967, 283:1. 1981, 87:1, eff. April 20, 1981.

# TITLE XX
# TRANSPORTATION
# CHAPTER 229
# HIGHWAY SYSTEM IN THE STATE

## Section 229:5

**229:5 Classification.** – Highways of the state shall be divided into 7 classes as follows:

I. Class I highways shall consist of all existing or proposed highways on the primary state highway system, excepting all portions of such highways within the compact sections of the cities and towns listed in RSA 229:5, V, provided that the portions of the turnpikes and the national system of interstate and defense highways within the compact sections of these cities and towns shall be class I highways.

II. Class II highways shall consist of all existing or proposed highways on the secondary state highway system, excepting all portions of such highways within the compact sections of the cities and towns listed in RSA 229:5, V.

III. Class III highways shall consist of all recreational roads leading to, and within, state reservations designated by the legislature.

III-a. Class III-a highways shall consist of new boating access highways from any existing highway to any public water in this state. All class III-a highways shall be limited access facilities as defined in RSA 230:44. Class III-a highways shall be subject to the layout, design, construction, and maintenance provisions of RSA 230:45-47 and all other provisions relative to limited access facilities, except that the executive director of the fish and game department

2

EXHIBIT 2

Received:                        Jan  7 2008 04:49pm
FROM                             <MON>JAN  7 2008 10:48/ST. 10:47/No. 7500000405 P  1



# COOPER
# CARGILL
# CHANT
ATTORNEYS AT LAW

### FAX TRANSMISSION - January 7, 2008
### with mail confirmation

**NOTICE:** The information contained in this fax transmission is intended only for the individual or entity named. **THIS INFORMATION MAY BE PRIVILEGED AND CONFIDENTIAL.** If the reader of this message is not the intended recipient, you are hereby notified and instructed not to read anything beyond this notice and you are further prohibited from disseminating, distributing or copying any part of this communication. If you received this fax transmission in error, please call us collect at (603) 356-5439.

**FAX NUMBER:** 625-5650            **TOTAL PAGES:** 3

Rachel A. Hampe, Esq.
McLane, Graf, Raulerson & Middleton, P.A.
P O Box 326
Manchester NH 03105-0326

Re:   Bedrock Realty Trust v. Town of Madison
      Docket No.: 03-E-061, 03-E-114, 03-E-144, 05-E-0014
      CDC File No.: 1101.162

Dear Rachel:

I am in receipt of your letter of January 7, 2008.

I am not sure what the Selectmen intend to do, and nor will I violate attorney-client privilege and share what I may or may not have discussed with them.

I believe, however, both at Mr. Bourne's deposition and during the trial, I discussed with him and with Mr. Arruda, the consequences of Mr. Bourne challenging the Class VI Road status in light of both the frontage requirements of the Madison zoning ordinance and the limitations of RSA 674:41.

674:41 Erection of Buildings on Streets; Appeals. –
I. From and after the time when a planning board shall expressly have been granted the authority to approve or disapprove plats by a municipality, as described in RSA 674:35, no building shall be erected on any lot within any part of the municipality nor shall a building permit be issued for the erection of a building unless the street giving access to the lot upon which such building is proposed to be placed:
   (a) Shall have been accepted or opened as, or shall otherwise have received the legal status of, a class V or better highway prior to that time; or
   (b) Corresponds in its location and lines with:
      (1) A street shown on the official map; or
      (2) A street on a subdivision plat approved by the planning board; or

RANDALL F. COOPER . KENNETH R. CARGILL . PAUL W. CHANT . CHARLES L. GREENHALGH . DENNIS L. MORGAN
DEBORAH A. FAUVER . CHRISTOPHER T. MEIER . REBECCA J. OLESON
DORCAS H. DEANS – OF COUNSEL
Attorneys admitted in NH, ME, MA, OH

509

Case 1:12-cv-00251-PB   Document 6-2   Filed 07/30/12   Page 23 of 73

January 7, 2008                                                              Page 2

(3) A street on a street plat made by and adopted by the planning board; or

(4) A street located and accepted by the local legislative body of the municipality, after submission to the planning board, and, in case of the planning board's disapproval, by the favorable vote required in RSA 674:40; or

(c) Is a class VI highway, provided that:

(1) The local governing body after review and comment by the planning board has voted to authorize the issuance of building permits for the erection of buildings on said class VI highway or a portion thereof; and

(2) The municipality neither assumes responsibility for maintenance of said class VI highway nor liability for any damages resulting from the use thereof; and

(3) Prior to the issuance of a building permit, the applicant shall produce evidence that notice of the limits of municipal responsibility and liability has been recorded in the county registry of deeds; or

(d) Is a private road, provided that:

(1) The local governing body, after review and comment by the planning board, has voted to authorize the issuance of building permits for the erection of buildings on said private road or portion thereof; and

(2) The municipality neither assumes responsibility for maintenance of said private roads nor liability for any damages resulting from the use thereof; and

(3) Prior to the issuance of a building permit, the applicant shall produce evidence that notice of the limits of municipal responsibility and liability has been recorded in the county registry of deeds for the lot for which the building permit is sought; or

(e) Is an existing street constructed prior to the effective date of this subparagraph and is shown on a subdivision plat that was approved by the local governing body or zoning board of adjustment before the municipality authorized the planning board to approve or disapprove subdivision plats in accordance with RSA 674:35, if one or more buildings have been erected on other lots on the same street.

Previously, pursuant to RSA 674:41, I (c), the board of selectmen, as the governing body, had after review and comment voted to authorize building permits on Class VI roads, and it was for that reason that Mr. Bourne was able to get initially obtain a building permit. When Mr. Bourne challenged both Class VI status, both as a prescriptive highway and as a result of Kelsey easement, one of the reasons the board of selectmen "laid out" the Solomon Harmon road to the Bourne boundary was to permit the Board to continue to honor their settlement agreement with Mr. Bourne, and honor his building permit is he cleaned up the issues raised by the building inspector.

In light of Mr. Bourne having pursed the litigation to conclusion, as you admit in your letter the court ruled that there is no Class VI highway, therefore there is no statutory basis for granting Mr. Bourne a building permit pursuant to RSA 674:41, I (c).  Thus Mr. Bourne's property is served by a "private road", and I do not believe that the board of selectmen, as governing body, has adopted a policy to allow building permits on private roads pursuant to RSA 674:41, I (d).

I will request the Board to confirm whether they wish to consider granting Mr. Bourne a building permit pursuant to RSA 674:4, I (d).  If not, your client will have a right to appeal that decision to the ZBA as provided in RSA 674:4, II.



Received:                          Jan  7 2008 04:50pm
FROM                          (MON) JAN   7 2008 19:49/ST. 10:47/No. 7500000405 P   3

January 7, 2008                                                    Page 3

Thank you for your attention to this matter, and if you should have any questions, please do not
hesitate to call.

Very truly yours,

COOPER CARGILL CHANT, P.A.

Randall F. Cooper, Esq.
rcooper@coopercargillchant.com

RFC:rfc
enclosure(s)
cc: Board of Selectmen.

# EXHIBIT 3

9/27/06 CLIFFORD A. GRAVES
BOURNE V TOWN OF MADISON, ET AL.

Page 98

1   plan 6, lot 19, did not have any electric utility
2   power ---
3   A.  Yes.
4   Q.  --- going up to it?
5   A.  Yeah.
6   Q.  Okay.  And at some point, did you become aware
7       that the New Hampshire Electric Co-op was
8       attempting to install utility poles along Solomon
9       Harmon Road?
10  A.  Yes.
11  Q.  Okay.
12      (Graves Exhibit 43 marked for Id.)
13  Q.  (BY MR. WILLIAMSON)  Have you been in court in the
14      state-court action at all down at the Carroll
15      County Superior Court?
16  A.  Yes.
17  Q.  You have.  Were you possibly present when a
18      gentleman by the name of Larry Martin of the New
19      Hampshire Electric Co-op was testifying?
20  A.  No.  No, I wasn't.  I'm sorry.  I thought you
21      meant have I ever been.  I have been, but not in
22      this case.
23  Q.  Not in this case.

Page 99

1   A.  No.
2   Q.  Okay.  I'd like you to take a look at Exhibit
3       No. 43.
4   A.  Okay.
5   Q.  And ask if you recall seeing that at all at any
6       time.
7   A.  No, I've never seen this.
8   Q.  Okay.  Reading from Exhibit No. 43, top of the
9       page:
10      "Answer:  Yes.  We believe we were working in
11      the right of way and we were instructed to stop."
12      And further on down, at line number 13, let
13      me read it from 9, so it will be complete in the
14      context.
15      Well, starting at line 7, "Let me rephrase
16      the question.  When the police officer arrived,
17      did he order you to stop?"
18      "Answer:  Well, I have to back you up a
19      little bit, because I arrived after the police
20      officer.  I was in a different section of the
21      district.  Upon arriving, our crew had cut some
22      trees that we believed were in the Town's right of
23      way.  The police chief of Madison said he was

Page 100

1   under orders from the selectmen to cease and
2   desist."
3       So my question is, once again:  If Chief
4   Pickering -- or whichever chief you had at that
5   particular time -- was ordered to interfere or to
6   stop the work on the electric utility poles, who
7   would have ordered him to stop, other than the
8   selectmen?
9   A.  They were his bosses.
10  Q.  Okay.  Were you aware of this?
11  A.  Yes.
12  Q.  Okay.  And were you part of the decision to have
13      the chief stop the electric work?
14  A.  Again, I can't say, because I was never there as
15      much as I'd like to have been, due to my work
16      habits, so...
17  Q.  So is it fair to say that because ---
18  A.  I may have known about it afterwards.  I may have
19      been consulted, but I can't say for sure.
20  Q.  Okay.  Because of your very, very busy work
21      schedule, were you perhaps unable to attend
22      selectmen meetings from time to time?
23  A.  I was able to attend selectmen's meetings.  I made

Page 101

1   that a priority.  That was at 5:00 at night, so...
2   Q.  But you were aware that the police chief was under
3       order from the board of selectmen ---
4   A.  Yes.
5   Q.  --- to stop work on the road leading up to
6       Mr. Bourne's property.
7   A.  Yes.
8   Q.  Okay.
9   A.  Somehow or other.
10  Q.  Thank you.
11      Were you aware that the same Mr. Verrochi
12      that we've been talking about, on occasion in late
13      November and December of '02, was plowing and
14      sanding parts of Solomon Harmon Road ---
15  A.  Yes.
16  Q.  --- because of a problem with snowmobiles kicking
17      material back onto the thoroughfare?
18  A.  Yes.
19  Q.  Okay.
20      (Graves Exhibit 44 marked for Id.)
21  Q.  (BY MR. WILLIAMSON)  I ask if you've seen that
22      before, sir.
23  A.  Not to my knowledge.

26  (Pages 98 to 101)

b300ab6c-27e1-4c23-ae38-861a540a7982

# Transcript of the Deposition of John Arruda

**Date:** October 16, 2006

Samuel Bourne, Ind. and as Trustee
of Bedrock Realty Trust
vs.
Town of Madison, et al.

Megan M. Hefler, CCR, RDR
Phone: 603-472-5745
Fax: 603-472-4969
Internet: www.nhdepositions.com

Page 98

1  Q. Would it be fair to say that one-and-a-half inch?
2  A. I would assume so, but there's also no such thing
3     as crushed bank-run gravel.
4  Q. I understand.
5  A. I'm not sure what his statement is. It's either
6     bank-run gravel or crushed gravel.
7  Q. Did anybody explain to Mr. Bourne at any time from
8     the time that he purchased his property up to the
9     present day why he had to remove the crushed
10    whatever it was, stone or gravel, from his
11    driveway?
12 A. The only thing that I can remember, there was a
13    court order that was agreed upon by Mr. Bourne, an
14    agreement from Mr. Bourne through his attorney who
15    was Fay Melendy at the time --
16 Q. Right.
17 A. -- with Randy Cooper and the board of selectmen on
18    the road. That agreement was written there, went
19    to the court, everyone agreed to it.
20 Q. Would that have been Judge O'Neill in the Carroll
21    County Superior Court?
22 A. I believe so.
23 Q. And what, if you know, what did Judge O'Neill

Page 99

1     order? Did he basically just approve a
2     stipulation or did he make a ruling of his own?
3  A. I believe he approved what the agreement was
4     between the parties.
5  Q. And again, your understanding as to exactly --
6     your best recollection, what was the agreement?
7  A. Part of the agreement was that the stone that was
8     up on Mr. Bourne's property at the time, the
9     crushed stone, would not be used on the surface of
10    the road; that he would be allowed to use bank-run
11    gravel or crushed gravel.
12 Q. And again, just so the record is clear, this had a
13    problem with proper compaction?
14 A. Absolutely.
15 Q. All right. And if the compaction wasn't proper, I
16    assume you'd get erosion?
17 A. It would be erosion and probably somewhat
18    dangerous to travel.
19 Q. No. seven, "During the repairs to the access
20    right-of-way" -- this is Mr. Verrochi again and
21    he's talking about December 4 of 2003. "During
22    the repairs to the access right-of-way I was
23    ordered to stop work by the new Madison police

Page 100

1     chief." It says, "Pickerin," it's Pickering,
2     isn't it?
3  A. Yes.
4  Q. Pickering. Okay. Do you agree with that? Was --
5     did Chief Pickering perhaps at your direction
6     order Mr. Verrochi as stated in Exhibit No. 32 to
7     stop work on this Solomon Harmon Road?
8  A. I believe it's correct.
9  Q. Okay. Chief Pickering on his own again, December
10    4 of 2003, as far as you know would not have been
11    involved in this stopping-work procedure unless he
12    had been ordered to do so; is that correct?
13 A. I believe so.
14 Q. In other words, the chief normally takes his
15    orders from you, or at least he did in 2003?
16 A. He doesn't normally take his orders from us. If
17    we, if we have a problem which would be a legal
18    matter, we would address the matter with him.
19 Q. Right. And that was not unusual for the chief to
20    go out, if he was so requested by the board of
21    selectmen, and order some work to be stopped?
22 A. In this particular case, we asked him to do that.
23 Q. Fine. There's no question that you told the chief

Page 101

1     to instruct Mr. Verrochi, no question in your mind
2     that you or the other members of the board
3     basically told Mr. Pickering, the chief, to have
4     Verrochi stop work on the driveway; is that
5     correct?
6  A. I believe so, yes.
7  Q. And that driveway we're talking about is Solomon
8     Harmon Road which was attempting or which was
9     being attempted repairs with crushed stone and
10    topping it off with crushed bank-run gravel?
11 A. Yes.
12        (Exhibit 33 marked.)
13 Q. When snowmobiles, and I understand there's been a
14    change in the law courtesy of House Bill 166, but
15    do I understand now that during the winter months
16    the board of selectmen if they so wished can
17    designate a Class VI road to be used by either
18    ordinary motor vehicles and/or snow machines; is
19    that correct?
20 A. Yes.
21 Q. All right. And as far as you know, has your
22    experience been that there is a problem with
23    grooming the trails or keeping them in proper use

26 (Pages 98 to 101)

21

1   situation.

2          THE COURT: Well, make an offer of proof as to

3   what he's going to testify to.   What is he going to testify

4   to?

5          MR. BOURNE: He's going to testify to what he

6   needs from the court as an order to allow the Electric Coop

7   to install power within the right-of-way to their own

8   safety standards, because as the court order stands right

9   now, it only allows installation of power and trimming of

10  trees.   Some trees need to be removed.   And when the power

11  company went to install power along that right-of-way, Mr.

12  Cyr went out to stop them.   He called the police.   He had

13  them order the Electric Coop off the right-of-way.   They

14  sent threatening letters to the Coop.

15          THE COURT: Okay.   Call your witness.

16          MR. BOURNE: Larry Martin.

17          LARRY MARTIN, RESPONDENT'S WITNESS, SWORN

18          THE COURT: Your question, Mr. Bourne.

19                    DIRECT EXAMINATION

20  BY MR. BOURNE:

21      Q    Larry Martin, has the Electric Coop been notified

22  many times with different letters regarding this particular

23  right-of-way?

24      A    Have we been notified?

25      Q    Have you been sent letters in reference to the

29

1    A    Yes.  We believe we were working in the right-

2  of-way and we were instructed to stop.

3    Q    Did the Cyr's also contact the local police

4  department and also did -- and what was stated from the

5  local police officer when he arrived?

6    A    It was -- I'm sorry?

7    Q    Let me rephrase the question.  When the police

8  officer arrived, did he order you to stop?

9    A    Well, I have to back you up a little bit because

10  I arrived after the police officer.  I was in a different

11  section of the district.  Upon arriving, our crew had cut

12  some trees that we believed were in the town's right-of-

13  way.  The Police Chief of Madison said he was under order

14  from the selectmen to cease and desist.

15    Q    Okay.  And do you know who called the police

16  department?

17    A    I do not know who called.

18    Q    But you did state prior to that the petitioner,

19  Roger Cyr, himself, or was it one of his family members

20  that ordered the crew off the right-of-way?

21    A    Mr. Cyr was present when I drove up.

22    Q    Okay.  Do you know if he personally ordered them

23  off the right-of-way?

24    A    He was the one who told me that we were in

25  violation because there was pending litigation on the road

56

1        the only thing I have to say.

2                THE COURT:  Okay.  Mr. Cooper.

3                MR. COOPER:  Your Honor, I did file an

4        objection in this, and there's two bases for this

5        objection; and I would like one affirmative ruling

6        by the Court.  First of all, one of the issues in

7        this Motion for Contempt is Mr. Bourne has made

8        certain allegations with respect to the Town

9        interfering with Mr. Verrochi and the police chief

10       doing the same.  Number one.  And that was all

11       based on hearsay statements by Mr. Bourne as to

12       what Mr. Verrochi told him or didn't tell him.  I

13       have looked throughout the courtroom and

14       Mr. Verrochi isn't here.  I would say right now,

15       Your Honor, there can be no offers of proof made

16       with respect to what Mr. Verrochi would testify to

17       or not testify to.  I can tell you, however, that

18       the chief of police is here.  And I will make an

19       offer of proof that he made -- made none of the

20       statements that are alleged in that particular

21       motion to Mr. Verrochi and did not tell him he

22       could not do the work.  So, one, I would like that

23       particular motion denied.  However, in the context

488

# EXHIBIT 4

9 November 2002

## MEMORANDUM TO ROGER CYR

From: Bob King, 367-4523

Subj: Solomon Harmon Road

Thanks for sending me a copy of the licensing agreement between the Selectmen and the Bournes. I agree that this represents a huge and potentially costly blunder by the Selectmen.

According to Bob Babine (and confirmed by the Selectman that I talked to), the Selectmen signed the agreement without reading it, assuming it to be the standard agreement that they had used in the past. They didn't realize that Sam Bourne had modified it. The Selectmen now realize that they made a mistake and are depending on Town Counsel to get the matter straightened out. Putting it another way, the Selectmen blundered but are clearly on our side of the issues involved.

As to your immediate concern about Bourne blocking off the road, he has been ordered not to do so by the Code Enforcement Officer, and if he does so, he will be subject to fines under the Town's regulation against road obstruction. Moreover, the Code Enforcement Officer will remove the obstruction as soon as he knows about it.

Private parties may not make improvements, including cutting trees, on any Class VI road without a license to do so from the Selectmen. This is specified in RSA 236:9, RSA 41:11, and RSA 231:139-156. See also NH Practice Vol 16, Section 55.02 in the Madison Library.

The Selectmen have no authority to surrender public rights in a Class V (nor any other) road, nor to give rights to an abutter that would effectively negate those public rights. This law was established by Marrone v. Hampton, 123 NH 729, 464 A.2d 907 (1983) and is discussed in NH Practice Vol 16, Section 54.01. Authority to discontinue a road is reserved to the Town Meeting (legislative body).

→ A major concern is that Bourne's new property will be worth less than what he paid for it if his permit and/or exclusive road rights are denied, and that he will sue the Town for causing this loss. His purchase agreement may have contained a contingency clause making the sale contingent on securing the permit and exclusive road rights. Another major concern is that this possibility may induce the Selectmen to make adverse concessions in the negotiations to follow.

I believe that we should urge the following actions during your appointment on the Selectmen's next meeting agenda:

- In the event Bourne obstructs the road again, impose a fine per the Selectmen's Regulation prohibiting road obstruction. (This regulation is posted at the Post Office).
- Work with Rep. Don Philbrick to change the law that prohibits dual use of Class VI roads by snowmobiles and highway vehicles.
- In the meantime, adopt a policy of not issuing permits for construction on Class VI roads unless the property owner formally agrees not to plow the road or operate highway vehicles on it in winter.

EXHIBIT
26
Jones
6/29/09 cpd-
PENGAD 800-631-6989

- Also require permit seekers to agree to dual use arrangements for highway vehicles and snowmobiles in the event state law is eventually changed to allow this on Class VI roads.
- Discontinue giving permitees a "blank check" right to improve the road without limitation. Instead, make such improvements subject to Selectmen's prior approval and the Highway Agent's supervision. Improvements should be consistent with the Class VI character of the road and with the Town's policy of not encouraging development on them.
- Ensure that permitees understand that the Class VI road involved is not in any sense their private driveway, but a public highway on which all users have equal rights. In particular, maintenance performed by the permitee does not confer any enhanced rights to the road.
→ - Address the issue of allowing utility poles and lines on Solomon Harmon Road, which is only two rods (33 feet) wide.
- In the future, give public notice before approving any permits for construction on Class VI roads. Specifically notify the SOS and Conservation Commission of such permit requests pending.
- In conjunction with the Planning Board, develop a Town policy on the criteria and specifications for granting building permits on Class VI roads, using RSA 674:41 as a guide. This policy could place limits on such things as road improvements, allowable distance from the Class V road, erection of utility lines, seasonal use, and maximum construction value.
- Despite the leverage Bourne has gained as a result of the Selectmen's blunder, make no concessions to him in the negotiations in this matter.

It will be counterproductive to "rake the Selectmen over the coals" for the mistake they have made. The meeting will be videotaped and broadcast, and the minutes will go out over the internet. Rather, we should stay positive, recognize that they and we are on the same side, recognize that they will be constrained in what they can say because of the possibility of litigation, and make solid recommendations about what must be done to solve the problem.

I urge you to get SOS Club officers/members actively involved in this issue.

Robert D. King


Copy To:  Don Pray (by Email)

# EXHIBIT 5

# TOWN OF MADISON
## CODE ENFORCEMENT OFFICER
POST OFFICE BOX 248
MADISON, NEW HAMPSHIRE 03849-0248

Phone: 603-367-4332

Fax: 603-367-4547

February 6, 2004

Bedrock Realty Trust
Mr. Samuel Bourne, Trustee
P.O. Box 545
East Bridgewater, MA  02333

VIA Certified Mail 7002 0860 0006 7186 4520

Dear Mr. Bourne:

This letter is a follow up to Building Permit #1483 issued on May 7, 2003 and the conditions which allowed the issuance of said permit.

One of the conditions was that the land area where the new house is to be constructed be taken out of current use status. As this has never taken place, the Town has no alternative but to revoke your building permit #1483. When all the conditions are met pertaining to this point, the Town will consider the re-issuance of said permit.

The other problem that has to be dealt with is the work that has taken place on the old cabin without the proper permits. I must ask that you give me written permission to enter your property, preferably in your presence, so that I may assess the situation and take the proper steps to resolve the situation.

I will be waiting to hear from you to learn what your intention will be in this matter. If you have questions, or if I can be of further assistance, please feel free to call me at the above number on Tuesday, Wednesday, or Friday mornings between 8:00 a.m. and 11:00 a.m.

Sincerely,

Robert M. Babine
Code Enforcement Officer

RMB/msa
Copy to: Selectmen
          Town Attorney
          File

497



Deposition Exhibit
6  Babine
10-16-06

# EXHIBIT 6

## AFFIDAVIT OF ROD WOOD

I, Rod Wood of Sanbornville NH, having been duly sworn, depose and state as follows:

1. I am vise president of Brett S. Purvis and Associates Inc. Municipal Assessing Consultants.
2. During 2004, while at the town hall of Madison NH, I was informed by the selectmen's assistant, Melissa Shackford Arias, that the building inspector had revoked Mr. Bourne's building permit, for allegedly building outside of the one acre not in current use.
3. After such notice I then informed Ms. Arias that the town was in error for revoking Mr. Bourne's permit for the alleged infraction.
4. I also informed Ms. Arias that the proper procedure is to send an assessment bill to the land owner within one year for any additional land taken out of current use and not to revoke a landowner's permit.
5. I also informed Ms. Arias that the town had violated the Current use laws.
6. Mr. Bourne was not aware of the above statements until 7-15-2008, in which he was informed of this during a tax appeal hearing.

Date 7/24/2008

_____
Rod Wood

STATE OF NEW HAMPSHIRE
COUNTY OF Rockingham

Sworn to and subscribed before me, the under-signed officer, this 24 day of July, 2008.

_____
Notary Public/Justice of the Peace

501

# EXHIBIT 7



! This is an urgent message.

Date:   Sunday, January 9, 2005 2:13 PM

From:   Robert King <rdkingx2@earthlink.net>

To:     Lisa at Valley Trail Assn <CHARRETTEFLOOR@aol.com>, Fred Watson, ValleyTrails <watsonnh@msn.com>, Gary R. Williams, ValleyTrails <willies@ncia.net>, Stephen Jones, SOSSC <watsonhilltop@adelphia.net>, Snowmobile Club, SOS <SOSSCCOM@sossc.com>, Don Pray <Praysurvey@aol.com>

Subject:   Hearing on layout of Solomon Harmon Road

TO ALL WITH AN INTEREST IN SNOWMOBILING IN MADISON:

This is to make sure you are aware of David Davis's petition to the Selectmen asking them to lay out a Class VI road over the existing course of Solomon Harmon Road from East Madison Road to the boundary of the McNair easement tract. The hearing on this subject began on 14 December and will continue at 5:00PM on Tuesday, 11 January, at the Town Hall.

I urge you to have a representative from the snowmobilers attend and speak out for the importance of this access to the McNair Easement and its further importance as a vital link in the overall snowmobile trail network.

The Selectmen are interested in the layout idea as a way to pre-empt the Sam Bourne lawsuits challenging the public's rights to the road. Even if appealed, the issues involved in proving the public need for the layout are simpler and easier to litigate than the complicated issues of proving the prescriptive origins of the road.

In this regard, you should be aware that a fatal defect has been discovered in the so-called Kelsey easement of 1978 which was meant to guarantee public access along the same route. Kelsey, who at the time owned only the Solomon Harmon lot (now Bourne lot) did not have a right to grant an easement over property other than his own. Hence the part of the road that is on Cyr and Davis land is not covered by the Kelsey easement.

What this means is that the only right the public has across Cyr's and Davis's land is by virtue of the old town road to Solomon Harmon's homestead site. Hence we have lost our comfortable redundancy of rights across that land. This is why Bourne is now focussed on challenging the existence of an old town road along that course. A trial on that issue would be very expensive, and the Selectmen wish to avoid it.

Your interest in this matter is, it seems to me, to be very emphatic about the importance of this particular public access route -- not only for snowmobiling, but for all the uses allowed on the McNair Easement and for fire protection.

I must tell you that Marc Ohlson represented the Conservation Commission and Planning Board at the 14 December hearing and he assigned very little importance to the route. This was left to me and a fire department representative to insist otherwise. That's why your representation on 11 January would be especially helpful. Public need for the route must be firmly established to justify a layout.

## Bob King

Robert D. King
68 Westview Drive
Madison, NH 03849-5477
Phone: (603) 367-4523
Email: RDKingX2@earthlink.net

P.S.: I noticed in December that Bourne has the road heavily posted with signs saying "no trespassing" and "private lane" where it passes through his property. I have met with the Police Chief and demanded enforcement of Selectmen's Regulation 1989-12, which expressly prohibits what Bourne has done and makes it a fineable criminal violation. The Chief wanted first to coordinate his law enforcement actions with Randy Cooper, who is handling the civil litigation regarding the road. I will follow through on this to push for aggressive criminal action against Bourne. In the meantime, I urge you to use the road freely as you have done in the past, ignoring the signs altogether.

Copyright © 2009 Road Runner Holding Co. LLC  |  Advertise with Us  |  Web Privacy Policy  |  Privacy Policy  |  Sign Up for Road Runner

EXHIBIT
62
Jones
6/29/09 cpy

❗ This is an urgent message.

Date:      Monday, January 24, 2005 5:25 PM

From:      Robert King <rdkingx2@earthlink.net>

To:        Stephen Jones, SOSSC <watsonhilltop@adelphia.net>, Snowmobile Club, SOS
           <SOSSCCOM@sossc.com>

Subject:   Notice of Decision on layout of Solomon Harmon Road

TO ADDITIONAL ADDRESSEES INADVERTENTLY LEFT OUT OF ORIGINAL MESSAGE:
----- Original Message -----
**From:** Robert King
**To:** Don Pray ; Gary R. Williams, ValleyTrails ; Fred Watson, ValleyTrails ; Lisa at Valley Trail Assn
**Sent:** Monday, January 24, 2005 5:22 PM
**Subject:** Notice of Decision on layout of Solomon Harmon Road

TO SNOWMOBILING INTERESTS IN MADISON:
        This is to make sure that you are aware of the scheduled Notice of Decision on the layout of Solomon
Harmon Road in the lower Town Hall on Tuesday evening (January 25). This event will immediately follow a
5:00 PM hearing on the lease of Silver Lake boat landing to the NH Fish & Game Department. No telling how
long the boat ramp hearing will take.
        Notice of this event appeared in the Conway Daily Sun on Saturday and again today.
        The Notice of Decision is in the nature of an announcement concerning the Selectmen's decision on the
layout. They will review the Town Counsel's written decision, amend it as they see fit, and approve it in final
form for recording and promulgation. This may be followed by a discussion of the decision with the public.
        Based on their last meeting about the layout, we can expect that they will approve a layout of the road
corresponding closely with the Kelsey public right-of-way easement and with public uses consistent with the
McNair conservation easement. The road will start on East Madison Road and terminate at Bourne's
boundary line. The road width will be only 30 feet, assuring that it cannot be used for subdivision. A road
regulation will subsequently be adopted to limit the road's use consistent with the McNair easement.
        Continuation of the public's right-of-way beyond Bourne's boundary (and across his land to the McNair
parcel) will continue to rely on the Kelsey-granted easement. (As you'll recall, Kelsey owned the same land as
Bourne and therefore had the right to grant a public easement across it. On the other hand, he didn't have a
right to grant such an easement across the land then owned by James and now owned by Cyr and Davis.)
        Unfortunately the language of the McNair and Kelsey easements does not clearly allow snowmobiles.
This allows Bourne to make an issue about snowmobile use. Although I would be optimistic, there's really no
telling how such an issue would be resolved by a court. The Selectmen support continued snowmobile use
but are necessarily concerned about the cost of litigation over the issue. They are therefore looking for a way
to preserve snowmobile use at least cost to the Town. Plan A is a negotiated re-routing of the snowmobile
trail so that it avoids Bourne's dwelling rather than following the Kelsey-granted right-of-way. All other uses
would remain in place on the Kelsey-granted route. Plan B would presumably be to lay out a Class VI road
across Bourne's land (same as the Kelsey-granted route) and then regulating it to include snowmobile use.
Plan B would require payment of damages because of slightly increased public rights. It would also
necessitate a surveyed plan of the route.

## Bob King
### Robert D. King
68 Westview Drive
Madison, NH 03849-5477
Phone: (603) 367-4523
Email: RDKingX2@earthlink.net

Copyright © 2009 Road Runner Holding Co. LLC  |  Advertise with Us  |  Web Privacy Policy  |  Privacy Policy  |  Sign Up for Road Runner

# EXHIBIT 8

**EXHIBIT**
6/
Jones
6/25/09 cpd

Date:      Friday, February 24, 2006 6:34 PM

From:      R. D. King <rdkingx2@earthlink.net>

To:        Stephen Jones, SOSSC <watsonhilltop@adelphia.net>, David Charrette <CHARRETTEFLOOR@aol.com>

Cc:        Fred Watson <watsonnh@msn.com>, Gary R. Williams <willies@ncia.net>

Subject:   Possible meeting in early April regarding the Bourne Case

CONFIDENTIAL TO PRESIDENT STEVE JONES & TRAIL ADMINISTRATOR DAVID CHARRETTE OF SOSSC:
    This is to give you a "heads up" on a possible meeting that you'll be asked to attend shortly after Town Counsel Randy Cooper returns from his long vacation on April 1.
    I have asked the Madison Selectmen to arrange a non-public meeting between them, the town Counsel, the President of SOSSC, and the SOSSC Trailmaster at the earliest opportunity after Randy returns, which might be Tuesday, April 4, either just before or just after the regular Selectmen's meeting in the late afternoon of that date. It would be good if you'd put that tentative appointment on your calendars.
    Sooner or later, you can expect to receive a confirmation of this meeting directly from the Selectmen.
    The purpose of this meeting would be to discuss the snowmobile aspects of the Bourne case, which was postponed from February 13 to some later date after Randy's return. It could possibly be scheduled for very soon after Randy's return.
    More specifically, at the pretrial hearing on February 1, Randy told the judge that this case boils down to the single issue of whether snowmobiles have a right to use the Kelsey easement to access the McNair parcel and Bald Ledge from the north. The basis of this issue is that the 1976 McNair Public Recreation Easement specifies that snowmobiles are allowed "only on existing trails." In turn, the Kelsey easement (which allows the public to get from Solomon Harmon's ruins to the Bourne parcel's south boundary) imposes a restriction against "motorized recreational vehicles," but at the same time allows "other uses as permitted by the McNair easement." Hence snowmobiles are allowed on the Kelsey easement only if that snowmobile route was in use at the time the McNair easement was signed in December 1976.
    The problem at hand is to prove to the judge that in December 1976, snowmobiles were already using, on a customary basis, the route described in the Kelsey easement, which is essentially the route being used today. Proving this will require credible testimony from credible witnesses that were active snowmobilers that long ago. Trail map evidence would also be critical to such proof.
    On the other side, we know from certain old records that Kelsey was quite adverse to snowmobiles on his property, and he is listed as one of Bourne's witnesses. Kelsey now lives in Florida. If he were to testify that snowmobiles were not using that route through his land in 1976, we'd have a tough time overcoming that testimony.
    While the Town has a very powerful case to defend the old town road running from Cyr's place to Solomon's ruins, and while the Kelsey easement is similarly secure, the right of snowmobiles to use this route is tenuous. Proving it will be a crap-shoot.
    Accordingly, it is appropriate to see if we can use the leverage of the lawsuit to secure an alternate snowmobile route through Bourne's property. We would be in a far better position to secure such a route as part of a settlement that we would if we lost this issue at trial.
    At the meeting in April, you should be prepared to discuss possible alternative routes that follow a different course through Bourne's property. A route, for instance, that skirts well to the east of Bourne's cottage, even though it enters and leaves his property at the same wall openings that are being used today. Bear in mind we're talking only about a snowmobile trail relocation, not a relocation of the existing public roadway.
    Another thing to bear in mind is that the Selectmen must follow a directive from the 2000 Town Meeting to resolutely defend the Town's documented Class VI roads. They are intent on doing this. However, the 2000 directive does not require them to defend specific snowmobile routes. Indeed, the Town's taxpayers and voters will likely be very upset if the Selectmen were to spend tens of thousands of dollars defending a snowmobile trail that could just as well have followed a different route.
    Between now and early April, I hope you will investigate the terrain and see if you can find a satisfactory alternative route across Bourne's parcel. My own sense is that you'll be able to find a route that will require tree-cutting, but no bridgebuilding, filling, or excavation.
    One thing you won't want to see happen is for this lawsuit to be settled without your input.
    Please keep in touch.

                                        Bob King

Copyright © 2008 Road Runner Holding Co. LLC  |  Advertise with Us  |  Web Privacy Policy  |  Privacy Policy  |  Sign Up for Road Runner



# EXHIBIT 9

Davis - Direct

96

1   establish from him is that he was asked to do this?

2        MS. HAMPE:  Right.  I'll get -- but I want to build --
3   I want to relate it to the timing of events, Your Honor.  It's
4   background information.

5        THE COURT:  Well, why don't you ask him that question
6   first, then we'll decide whether the rest of it is relevant.

7        MS. HAMPE:  Okay.

8   BY MS. HAMPE:

9        Q.  So as you testified at your deposition, you got the idea
10  to lay out the road from a conversation you had with Mr. Arruda?

11       A.  True.

12       Q.  And he actually gave you the information to do that, to
13  lay out the road?

14       A.  True.

15       MS. HAMPE:  I'd like to move backwards a little bit,
16  Your Honor, with the timing of things.

17  BY MS. HAMPE:

18       Q.  So on September 1st you're denied a building permit and
19  then there was another meeting on September 7th where the
20  selectmen discussed that you needed to sign a liability waiver.
21  Isn't that correct?

22       A.  True.

23       Q.  And then on September 8th, you received a letter from

# EXHIBIT 10

STATE OF NEW HAMPSHIRE

CARROLL, SS.                                    SUPERIOR COURT

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

SAMUEL BOURNE, INDIVIDUALLY

AND AS TRUSTEE OF BEDROCK

REALTY TRUST

v.                                             08-E-0027

TOWN OF MADISON; COOPER, DEANS

& CARGILL; RANDALL COOPER,

INDIVIDUALLY AND OFFICIALLY;

ROBERT KING; ROBERT BABINE,

BUILDING INSPECTOR

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

DEPOSITION OF RANDALL F. COOPER

This deposition taken at the offices of
Cooper, Cargill & Chant, 2935 White Mountain
Highway, North Conway, New Hampshire, on
Thursday, September 17, 2009, commencing at
10:06 a.m.

1 Q.   Did you falsify the notary of witness on the

2      Kelsey deed?

3 A.   I am going to object as being irrelevant to the

4      matters presently in dispute, and also indicate

5      that I'm not going to answer based upon that.

6          MR. WALKER:  I join in his objection.

7 Q.  (BY MR. BOURNE)  Last question.

8          Did the selectmen all agree to fight, at all

9      cost, for the snowmobile trail?

10 A.   Privileged.

11          MR. BOURNE:  No further questions.

12          EXAMINATION

13 Q.  (BY MR. WALKER)  Mr. Cooper, do you read the Conway

14      Daily Sun?

15 A.   Not every day.

16 Q.   But over the years, have you read it from time to

17      time?

18 A.   Absolutely.

19 Q.   It was reported in the public press, the Conway

20      Daily Sun, that Mr. Bourne ---

21          MR. BOURNE:  Objection.  You're speculating.

22 Q.  (BY MR. WALKER)  Why don't you wait until I finish

23      the question.

# EXHIBIT 11

Doc # 0002869 Mar 24, 2010 1:19 PM

*[signature]*

Register of Deeds, Carroll County

## Affidavit of Patrick M. Kelsey

I, Patrick M. Kelsey, having been duly sworn and affirm under the pains and penalties of perjury that the information contained in this affidavit are true to the best of my knowledge and I state as follows:

1. My wife and I signed the foot trail easement document Book 734, page 78-80, at the home of professor Hockings on Friday, January 5, 1979 in the evening approximately 7:00 PM.

2. The only people present at the time of signing the easement, was Malcolm McNair, Mr. Hockings, my wife Patricia K. Kelsey and myself.

3. Attorney Cooper was <u>not</u> present at the time that I signed the "foot trail" easement, Book 734, Page 78-80.

4. I remember very distinctly that the age of both Mr. McNair and Mr. Hockings where approximately in their seventies back in 1979.

5. When first asked, I did not recall Mr. Hockings last name, until March 15, 2007 when Mr. Robert D. King reminded me after the trial that I testified in, of the name of the older gentleman who was present with Mr. McNair back in 1979.

6. There was <u>no</u> notary present at the time I signed the foot trail easement, Book 734, Page 78.

7. My intent was to create a limited use foot trail as requested by Malcolm McNair. It was <u>never</u> my intention to create a Public Highway for motorized vehicle use.

8. The first time I met Attorney Cooper was during a trial held on March 12-15, 2007 in which Attorney Cooper questioned me regarding the deed noted above.

Dated: 4/21/09 _____     Patrick M. Kelsey *[signature]*

BK 2848 PG 0917

STATE OF CALIFORNIA
COUNTY OF _____

Sworn to and subscribed before me, the under-signed officer, this ____ day of April, 2009.

_____
Notary Public/Justice of the Peace



# CALIFORNIA JURAT WITH AFFIANT STATEMENT

☑ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–5 to be completed only by document signer[s], *not* Notary)

_____
Signature of Document Signer No. 1

_____
Signature of Document Signer No. 2 (if any)

State of California

County of _Trinity_

Subscribed and sworn to (or affirmed) before me on this

_21st_ day of _April_, 20 _09_, by
  Date              Month                   Year

(1) _Patrick M. Kelsey_,
                Name of Signer

proved to me on the basis of satisfactory evidence
to be the person who appeared before me (.) (,)

                    (and

(2)_____,
                Name of Signer

proved to me on the basis of satisfactory evidence
to be the person who appeared before me.)

Signature _E.M. Stokley_
              Signature of Notary Public

**E. M. STOKLEY**
Commission # 1693069
Notary Public - California
Trinity County
My Comm. Expires Oct 8, 2010

Place Notary Seal Above

BK 2848 PG 918

──────────── **OPTIONAL** ────────────

*Though the information below is not required by law, it may prove valuable to persons relying on the document and could prevent fraudulent removal and reattachment of this form to another document.*

**Further Description of Any Attached Document**

Title or Type of Document: _Affidavit_

Document Date: _4-21-09_          Number of Pages: _1_

Signer(s) Other Than Named Above: _N/a_

| RIGHT THUMBPRINT OF SIGNER #1 | RIGHT THUMBPRINT OF SIGNER #2 |
|---|---|
| Top of thumb here | Top of thumb here |

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org   Item #5910   Reorder: Call Toll-Free 1-800-876-6827

Register of Deeds, Carroll County

## Affidavit of Patricia K. Kelsey

I, Patricia K. Kelsey, having been duly sworn and affirm under the pains and penalties of perjury that the information contained in this affidavit are true to the best of my knowledge and I state as follows:

1. My husband and I signed the foot trail easement document Book 734, page 78-80, at the home of professor Hockings on Friday, January 5, 1979 in the evening approximately _7:00_ PM.

2. The only people present at the time of signing the easement was, Mr. McNair, Mr. Hockings, my husband Patrick M. Kelsey and myself.

3. Attorney Cooper was <u>not</u> present at the time that I signed the "foot trail" easement, Book 734, Page 78-80.

4. I remember very distinctly that the age of both Mr. McNair and Mr. Hockings where approximately in their seventies back in 1979.

5. There was <u>no</u> notary present at the time I signed the easement, Book 734, Page 78.

6. My intent was to create a limited use foot trail as requested by Malcolm McNair. It was <u>never</u> my intention to create a Public Highway for motorized vehicle use.


Dated: _4-21-09_        Patricia K. Kelsey   _Patricia K. Kelsey_


STATE OF CALIFORNIA
COUNTY OF _____

Sworn to and subscribed before me, the under-signed officer, this _____ day of April, 2009.


_____
Notary Public/Justice of the Peace

BK2848PG0915

# CALIFORNIA JURAT WITH AFFIANT STATEMENT

☑ See Attached Document (Notary to cross out lines 1–6 below)
☐ See Statement Below (Lines 1–5 to be completed only by document signer[s], *not* Notary)

_____
Signature of Document Signer No. 1

_____
Signature of Document Signer No. 2 (if any)

State of California

County of _Trinity_

E. M. STOKLEY
Commission # 1693069
Notary Public - California
Trinity County
My Comm. Expires Oct 8, 2010

Place Notary Seal Above

Subscribed and sworn to (or affirmed) before me on this

__21st__ day of _April_____, 20 _09_, by
   Date           Month                    Year

(1)_Patricia K. Kelsey_____,
                 Name of Signer

proved to me on the basis of satisfactory evidence
to be the person who appeared before me (.) (,)

(and

(2)_____,
            Name of Signer

proved to me on the basis of satisfactory evidence
to be the person who appeared before me.)

Signature _E M Stokley_____
                Signature of Notary Public

—————————— **OPTIONAL** ——————————

*Though the information below is not required by law, it may prove
valuable to persons relying on the document and could prevent
fraudulent removal and reattachment of this form to another document.*

**Further Description of Any Attached Document**

Title or Type of Document: _Affidavit_____

Document Date: _4-21-09_____ Number of Pages: _1_

Signer(s) Other Than Named Above: _N/a_____



| RIGHT THUMBPRINT OF SIGNER #1 | RIGHT THUMBPRINT OF SIGNER #2 |
|---|---|
| Top of thumb here | Top of thumb here |

BK 2848 PG 0916

©2007 National Notary Association • 9350 De Soto Ave., P.O. Box 2402 • Chatsworth, CA 91313-2402 • www.NationalNotary.org   Item #5910   Reorder: Call Toll-Free 1-800-876-6827

## QUITCLAIM DEED

KNOW ALL MEN BY THESE PRESENTS, that PATRICK M. KELSEY and PATRICIA K. KELSEY of East Madison Road, Town of Madison,   County of Carroll, State of New Hampshire, for ONE DOLLAR and other consideration, GRANT TO THE TOWN OF MADISON, a New Hampshire municipal corporation existing pursuant to N.H.R.S.A. 31 et seq., located in the County of Carroll in said State, with QUITCLAIM COVENANTS,

A right of way over land located in Madison, County of Carroll, State of New Hampshire, leading from the southerly side of the Madison-East Madison Road to the northerly side line of property owned by Malcolm P. McNair, Jr., being the northerly side line of Lot #83 in the south division of the survey of the Town of Eaton (then including Madison); prepared by James Hersey in 1782. This conveyance consists of two parts; the first over property owned by the grantors herein, and the second over a right-of-way acquired by the grantors herein, over the property of George A. and Gunilla B. James.

PART ONE:    A right of way for those purposes as limited and covenanted below over land located in said Madison, by that land conveyed to said grantors by the Carroll County Trust Company by Quitclaim Deed dated October 19, 1978, and recorded at Book 726, Page 421, Carroll County Registry of Deeds, and bounded and described as follows:

> "South by land of Henry Harmon, East by land of Elmer Harmon and the Horace Harmon place so-called, North by land of the heirs of Jonathan Harmon and Harmon Farm, being the same land as deeded to us by Edward E. Hoyt and wife, deed dated April 29, 1909, and recorded in Carroll County Records, Book 139, Page 362."

Said right-of-way shall be a width consistent with the use of logging trucks, with the center line of the same to be the center of the existing old woods roadway as now located and constructed on the face of the earth as it roughly bisects the property above described in a north/south direction, running from a gap in a stone wall on the northerly side line of the property, where the roadway continues on to the property of George A. and Gunilla B. James, a distance of 1800 feet, more or less, to a gap in the stone wall on the northerly side line of land of Malcolm P. McNair, Jr.

The grantee, in consideration of this conveyance, agrees and covenants with the grantors, their heirs and assigns, to restrict the use of the right-of-way granted herein to a use consistent in discharging the responsibilities of the grantee under a Conservation Agreement between said grantee and Malcolm P. McNair, dated December 26, 1976, and recorded at Book 648, Pages 199 and 210, Carroll County Registry of Deeds.  Under the terms of said Agreement, the grantee, by its Conservation Commission, or its successors, shall use said right-of-way as access to lands encumbered by said Agreement, which said right-of-way currently affords the only practical access.  As required by said Agreement, the grantee, by its Conservation Commission, or its successors, will extend to the grantor of said Agreement, or his successors, currently Malcolm P. McNair, Jr., use of said right-of-way in connection with the rights reserved in said Agreement;  and further, said grantee, by its Conservation Commission, or its successors, will open said right-of-way to public use consistent with said Agreement as restricted for the purposes of:

CARROLL COUNTY REGISTRY

Percy Beach

VOID — NEVER LEGALLY ACCEPTED BY TOWN

WILLIAM D. PAINE, II
ATTORNEY AT LAW
NORTH CONWAY

LIBER 734 PAGE 78

1)   Hunting, fishing, and trapping in accordance with the applicable laws and regulations.
2)   Hiking.
3)   Snowshoeing.
4)   Cross-country skiing.
5)   Horseback riding.
6)   Other recreational or sporting uses which the Conservation Commission of the Town of Madison, New Hampshire or its successors, determines to be within the general purposes of the Agreement.

As further required and restricted in said Agreement, the grantee, however, by its Conservation Commission, or its successors, will restrict the use of motor vehicles of any type to the following exceptions only:

a)   The use of motor vehicles at any time by fire fighters, personnel of the Fish and Game Department, and law enforcement officers in the course of their duties.
b)   The use of motor vehicles by the parties to the Conservation Agreement as restricted and permitted therein.
c)   The use of motor vehicles by the grantors herein, and their authorized agents.

PART TWO:      A right-of-way for the same limited purposes as in Part One above, as amended below, over a right-of-way conveyed to the grantors by Quitclaim Deed, dated November 6, 1978, by George A. James Jr. and Gunilla B. James, recorded at Book 726, Page 422, Carroll County Registry of Deeds, and further bounded and described as follows:

"Commencing at the intersection of this right-of-way on the southerly side of the Madison Road as the latter trends from Madison Corner to East Madison, being a few feet easterly of a concrete bridge over culvert on the Madison Road; thence running southeasterly and thence southerly as said dirt road trends over land of the grantor to its intersection with the northerly sideline of land formerly of Carroll County Trust Company, and concurrently herewith being conveyed by it to the within grantees, and which roadway continues southerly toward the top of Bald Ledge. Said right-of-way shall be thirty (30) feet in width with the center line of the same to be the center line of the existing roadway as now located and constructed on the face of the earth, to the extent the same traverses over land of the grantor."

This conveyance is subject to the provisions of the above-mentioned deed; and the grantee herein, covenants to restrict its use and that of the public to the uses enumerated above, with the exception that any use by George A. James, Jr. and Gunilla B. James, their heirs, successors or assigns, cannot be so restricted.

We, Patrick M. Kelsey and Patricia K. Kelsey, husband and wife, hereby release our rights of homestead and all other interest in and to the above-entitled premises not excepted or reserved in the within conveyance.

WITNESS our hands and seals this 5th day of January, 1979.

Witness:

_____

_____

LIBER 734 PAGE 79

_____
Patrick M. Kelsey

_____
Patricia K. Kelsey

WILLIAM D. PAINE, II
ATTORNEY AT LAW

PART TWO INVALID
RIGHT OF WAY OVER RIGHT OF WAY

STATE OF NEW HAMPSHIRE
CARROLL, SS.

Personally appeared Patrick M. Kelsey and Patricia R. Kelsey, satisfactorily proven to be the persons whose names are subscribed above, and acknowledged the foregoing instrument to be their free act and deed, this ___5th___ day of ___January___, 197~~8~~, .

Before me,

_____
Notary Public
Commission Expires:


### PARTIAL RELEASE OF MORTGAGE

FOR VALUE RECEIVED, the CARROLL COUNTY TRUST COMPANY of Conway, New Hampshire, hereby releases the within-described premises from the operation of a certain mortgage given by Patrick M. and Patricia K. Kelsey, dated October 31, 1978, recorded in Carroll County Registry of Deeds, Book 726, Page 423.

The said mortgage is to otherwise remain in full force and effect.

WITNESS its hand this ___12___ day of ___January___ 1979.

Witness:

_____

THE CARROLL COUNTY TRUST COMPANY

By: _____


LIBER **734** PAGE **80**

WILLIAM D. PAINE, II
ATTORNEY AT LAW

# EXHIBIT 12

20004545 2

# STEWART TITLE
## OF NORTHERN NEW ENGLAND, INC.

165A South River Road, Bedford, NH  03110-6993  (603) 625-0033  FAX: (603) 627-0066

DATE:       October 08, 2002

TO:         Laconia Savings Bank
            10 Mutual Way
            Gilford, NH 03249

ATTN:

CASE #:   02021469

RE:       Samuel J. Bourne and Cheryl L. Bourne, Co-trustees of

Loan #:

Please find enclosed your Lender's Title Insurance Policy and
endorsements (if applicable) for the above referenced borrower.

If you have questions regarding this policy, please feel free
to contact our office.

Sincerely yours,



Sue Weingartner

encl

LSB016

Secondary Mortgage Market Endorsement

LENDER'S POLICY SECONDARY MORTGAGE MARKET - ATTACHED
TO AND MADE A PART OF POLICY OF TITLE INSURANCE
SERIAL NUMBER  M-9702-338544  ISSUED BY

FILE NO:  02021469

# STEWART TITLE

## GUARANTY COMPANY

Schedule B of the above-captioned loan policy is hereby amended as follows:

1) The policy affirmatively insures that the easement(s) set forth in Schedule B do not adversely affect the beneficial use and enjoyment of the buildings and improvements presently located on the insured premises.

2) The policy affirmatively insures that the restrictions, covenants and conditions set forth in Schedule B are presently not violated and that a future violation will not result in a forfeiture or reversion of title.

This endorsement is made a part of the policy and is subject to all of the terms and provisions thereof and of any prior endorsements thereto.   Except to the extent expressly stated, it neither modifies any of the terms and provisions of the policy and any prior endorsements, nor does it extend the effective date of the policy and any prior endorsements, nor does it increase the face amount thereof.

Signed under seal for the Company, but this Endorsement is to be valid only when it bears an authorized countersignature.

**STEWART TITLE**
GUARANTY COMPANY

Chairman of the Board

President

Countersigned:

Authorized Countersignature
  Stewart Title of Northern New England, Inc.
Company
  Portsmouth, NH
City, State
433- Secondary Mortgage Endorsement

| Endorsement | 9746-000051548 |
| Serial | |
| Number | E- |

LSB024

# EXHIBIT 13

UNITED STATES DISTRICT COURT
DISTRICT OF NEW HAMPSHIRE

SAMUEL J. BOURNE,
               Plaintiff
        v.

                                     Docket No. 10-ev-393-LM

JOHN R. ARRUDA, JR. individually and officially,
MICHAEL BROOKS individually and officially, and
TOWN OF MADISON,
               Defendants

## DEFENDANT MICHAEL BROOKS' CORRECTED RESPONSE TO INTERROGATORY 8

Now comes Defendant Michael Brooks and submits this corrected response to Interrogatory No. 8.   Defendant incorporates herein all objections set forth in the original response to interrogatories if fully set forth herein.

8.     Specify your relationship with the Scrub Oaks Scramblers Snowmobile Club, all communications thereof, and how long you have been a member.

**Answer:**

Defendant objects to this interrogatory as it is overbroad, unduly burdensome, vague in its request for "all communications thereof" and not reasonably calculated to lead to the discovery of admissible evidence on the sole remaining claims in this case.   Subject to and without waiving said objections, Defendant States:

My grandfather (Robert Chick) was one of the founding members of the Scrub Oak Scramblers snowmobile club. When I was a kid, we always had a family membership and were quite active with the group.

That said, in my adult life I have not been involved with the club at all. I do not have a current membership that I am aware of, though there is a possibility that my grandfather set up some sort of lifetime membership arrangement. I do not even own a snowmobile.

As to Objections:     _____
                      Brian J.S. Cullen


As to Responses:


Dated: _Octobr 4____, 2011          _____
                                    Michael Brooks

STATE OF _New Hampshire_

COUNTY OF _Carroll_


    Personally appeared, before me, Michael Brooks, this _4_ day of _October_, 2011, and acknowledged that the foregoing answers to the interrogatories are true and correct to the best of his knowledge and belief.


_____
Notary Public/Justice of the Peace
My commission expires:
Notary Seal:     MELISSA SHACKFORD ARIAS, Notary Public
                 My Commission Expires March 26, 2013

# Thank you all!!

**Addendum!** and we'd **ALL** like to thank Activities Coordinator, Lisa Charrette, for doing a fantastic job of coordinating yet another great event! :

**Radar Run Result**
**400 Fan**
1st----Emily Broz
2nd---Brittany Marlino
3rd---Carrie Broz
**500 Fan**
1st----John Powers
2nd---Chris Perley
3rd----Justin Goodreau
**600 Fan**
1st----Larry Cook
2nd---Thomas Gentilucci
3rd----Brodie Conway
**500 Liquid**
1st----Tom Allendy
2nd---Eric Julio
3rd----Mark Bedard
**600 Liquid**
1st----Scott Watts
2nd---Derek Maribito
3rd----Kaylee Brown
**700 Liquid**
1st----Asa Knowles
**800 Liquid**
1st----Asa Knowles ---------Top Speed 99 mph
2nd---Jeremy Goodman
3rd----Andy Kimball
**900 Liquid**
1st----Jeremy Goodman
2nd---Bob Danforth
3rd---Ed Conway
**1000 Liquid**
1st----Asa Knowles
2nd---Scott Watts
3rd----Josh Shackford
**1000 4-Stroke**
1st----Steve Borges
2nd---Daniel Coyle
3rd---George Clausen
TOP SPEED---------99 mph

• © Copyright 2009 - Scrub Oak Scramblers Snowmobile Club. All rights reserved.
Email the club at SOSClub@sossc.com

# EXHIBIT 14

THE STATE OF NEW HAMPSHIRE

CARROLL COUNTY                                    SUPERIOR COURT

Samuel Bourne, Individually & Trustee of Bedrock Realty Trust

v.

Town of Madison, Cooper Deans and Cargill, Randall Cooper, Individually & Officially,
Robert King, Robert Babine, Bldg. Inspector

Docket No.: 08-E-0027

### ORDER

The petitioner Samuel Bourne alleges that the respondent Robert King made certain defamatory statements about him in emails Mr. King sent as well as in letters Mr. King wrote to newspapers. Mr. King moves to dismiss Mr. Bourne's allegations with regard to the emails. Mr. Bourne objects. Upon hearing after a review of the facts as pled, the parties' arguments, and the applicable law, the court finds and rules as follows.

Mr. Bourne and Mr. King have a history of legal entanglements. Mr. King was the lead researcher of the Class VI Road Committee in the Town of Madison ("the Town"), and Mr. Bourne objected to that committee's finding that a Class VI road ran across his property. In 2003, he filed several actions against the Town with regard to that road that were consolidated for trial. Bourne v. Town of Madison, Carroll County Superior Ct., Docket Nos. 03-E-0061, 03-E-0014, 03-E-0144, 05-E-0014 (August 10, 2007) (Order, Fitzgerald, J.) ("the State Litigation"). In 2005, while the State Litigation was pending, Bourne began litigation in the federal district court against, *inter alia*, the Town, its selectmen, and Robert King. Bourne v. Town of Madison, 494 F.Supp.2d 80 (D.N.H. 2007) ("the Federal Litigation").

Mr. King seeks dismissal with regard to statements in three emails. On December 29, 2004, Mr. King sent an email to three Town Selectmen, Town Counsel Randall Cooper, and Paul Mullen. Mr. Bourne alleges that this email contains defamatory statements, including that Mr. Bourne's actions were the product of a "sick mind." On August 27, 2006, Mr. King sent an email to three Town Selectmen, Town Counsel Brian



Cullen, and Mr. Cooper that stated that Mr. Bourne was a "pathological liar." On August 28, 2006, Mr. King sent an email to three Selectmen, Mr. Cullen, and Mr. Cooper stating that Mr. Bourne had exhibited some "sociopathic characteristics."

Mr. King moves to dismiss as to these three emails, arguing that Mr. Bourne has failed to state a claim upon which relief can be granted for defamation because his emails fall within the absolute privilege afforded to statements made in the course of judicial proceedings. Mr. Bourne objects.

"In reviewing a motion to dismiss for failure to state a claim upon which relief may be granted, [the court] assume[s] the truth of all facts alleged by the plaintiff and construe[s] all reasonable inferences in the light most favorable to [him]." Graves v. Estabrook, 149 N.H. 202, 203 (2003). In doing so, the court must determine whether the plaintiff's "allegations are reasonably susceptible of a construction that would permit recovery." Allen v. Dover Co-Recreational Softball League, 148 N.H. 407, 412 (2002) (quotations and citation omitted). If the non-moving party's version of the facts would constitute a basis for relief, the court should deny the motion to dismiss. Starr v. Governor, 148 N.H. 72, 73 (2002). When the motion to dismiss does not challenge the sufficiency of the legal claim, but instead raises defenses, the court must look to the plaintiff's allegations and determine whether he has demonstrated his claim to relief. Provencher v. Buzzell-Plourde Assocs., 142 N.H. 848, 853 (1998). Witness immunity is one such defense. Id.

With regard to civil liability, the law recognizes an absolute privilege, tantamount to an immunity, for statements made during judicial proceedings. See McGranahan v. Dahar, 119 N.H. 758, 762 (1979). It does so because judicial proceedings constitute a situation in which the public interest is so vital and apparent that it mandates complete freedom of expression without inquiry into a defendant's motives. See id. "[T]he general rule is that statements made in the course of judicial proceedings are absolutely privileged from civil actions, provided they are pertinent to the subject proceeding." Id. at 763. A statement is presumed relevant unless the plaintiff demonstrates that it was so palpably irrelevant to the subject matter of the controversy that no reasonable person can doubt its irrelevancy or impropriety. Provencher, 142 N.H. at 853 (citing McGranahan,

119 N.H. at 762) (quotation omitted). The purpose of the privilege is to encourage witnesses to testify and to ensure that their testimony is not altered or distorted by fear of potential liability. Provencher, 142 N.H. at 853. The privilege extends to pre-litigation communications between a witness and a litigant or attorney, if litigation was contemplated in good faith and under serious consideration by the witness, counsel, or possible party at the time of the communication. Id. at 855.

Here, the court finds that statements Mr. King made in his emails fall within the absolute privilege afforded to statements made during judicial proceedings. Mr. King's December 29, 2004 email was sent to Town Selectmen and Town Counsel after the State Litigation had commenced and before the trial on that matter. Mr. King, although not a party to the State Litigation, would have reasonably expected to be a witness in that case at the time he composed the December 29, 2004 email. When Mr. King sent the two emails in 2006, he was a party to the Federal Litigation, and was a litigant communicating with counsel in that case and with co-defendants. Accordingly, these statements are absolutely privileged and may not constitute a basis for civil liability.

For the foregoing reasons, the court grants Mr. King's Partial Motion to Dismiss Mr. Bourne's defamation claim arising out of the December 29, 2004, August 27, 2006, and August 28, 2006 emails.

So Ordered.

June 11, 2009

Steven M. Houran
Presiding Justice

3

## THE STATE OF NEW HAMPSHIRE

CARROLL COUNTY                                                    SUPERIOR COURT

Samuel Bourne, Individually & Trustee of Bedrock Realty Trust
v.
Town of Madison, Cooper Deans and Cargill, Randall Cooper, Individually & Officially,
Robert King, and Robert Babine, Bldg. Inspector

Docket No.: 2008-EQ-0027

### ORDER ON MOTION TO DISMISS

Currently before the court is Mr. King's motion to dismiss Mr. Bourne's remaining libel claims (index #199). Mr. Bourne objects. Upon consideration of the pleadings and arguments of the parties, and of the applicable law, the court finds and rules as follows.

No hearing on this motion was requested, nor does the court find that a hearing would assist it in determining the pending issues. Superior Court Rule 58. Accordingly, the court acts on the pending motion on the basis of the pleadings and record before it. Id.

In considering a motion to dismiss, the court must determine "whether or not the plaintiff's allegations are reasonably susceptible of a construction that would permit recovery." Cadle Co. v. Dejadon, 153 N.H. 376, 378 (2006) (quoting La Roach Adm'r v. Doe, 134 N.H. 562, 564 (1991)). In doing so, the court must "scrutinize the facts contained on the face of the petition to determine whether a cause of action has been asserted." Cadle, 153 N.H. at 378 (citing Williams v. O'Brien, 140 N.H. 595, 597 (1995)). When testing the pleadings, the court "assume[s] the truth of the facts alleged by the plaintiff and construe[s] all reasonable inferences in the light most favorable to him [or her]." Paul v. Sherbourne, 153 N.H. 747, 749 (2006) (citing DeWyngaert v. Bean Ins. Agency, 151 N.H. 406, 407 (2004)). However, the court "need not accept allegations in the writ that are merely conclusions of law." Silva v. Warden, N.H. State Prison, 150 N.H. 372, 374 (2003) (citing Konefal v. Hollis/Brookline Coop. Sch. Dist., 143 N.H. 256, 258 (1998)). When the facts, properly viewed, "do not constitute a basis for legal relief," dismissal is appropriate. Paul, 153 N.H. at 749 (citing DeWyngaert, 151 N.H. at 407).

Mr. Bourne's defamation claim alleges that Mr. King made four specific defamatory statements about him. Mr. King moves to dismiss the defamation claim, asserting that the alleged statements are either non-actionable expressions of opinion or made outside the statute of limitations or both. Mr. Bourne objects

The four statements that Mr. King moves to dismiss as bases for Mr. Bourne's defamation claim are as follows:

1. A letter by Mr. King to the editor of the Conway Daily Sun, published on November 15, 2006, in which Mr. King writes, in regard to a previously published letter by Mr. Bourne about Solomon Harmon Road, "I searched diligently but in vain for any truthful statement in it. This person spews falsehoods and misrepresentations at a rate and in a quantity that should win him a place in the Guinness Book of World Records." Additionally, Mr. King wrote, "Bourne's allegations about a fraudulent alteration of a certain map are delusional."

2. A letter by Mr. King to the editor of the Conway Daily Sun, published on February 25, 2008, in which Mr. King writes that Mr. Bourne has made "tediously repetitive false accusations" regarding alterations to a map depicting Mr. Bourne's property. In that letter, Mr. King also writes, "[a]s the saying goes, repeating a lie endlessly will not make it the truth." This letter was written in response to several letters published in the Conway Daily Sun in which Mr. Bourne refers to alterations he alleges were made to that map.

3. A message of October 19, 2006 by Mr. King to the editor of the Carroll County Independent criticizing the work of a reporter for the Conway Daily Sun for being persuaded by Mr. Bourne. In describing Mr. Bourne's ability to persuade the reporter, Mr. King writes, "[t]his is what a con man does[.]" Mr. King also forwarded this message to members of the snowmobile club concerned with its rights to traverse Mr. Bourne's property.

4. An email that Mr. King sent to members of a snowmobile club on November 6, 2003. Mr. Bourne alleges that Mr. King said, "Bourne is the nutcase who bought the camp on Solomon Harmon Road . . .."

2

Mr. King argues that these statements are expressions of opinion that cannot be construed as statements of fact, and that they therefore cannot support a claim for libel.

"[A] plaintiff proves defamation by showing that the defendant failed to exercise reasonable care in publishing a false and defamatory statement of fact about the plaintiff to a third party, assuming no valid privilege applies to the communication." Thomas v. Telegraph Publishing Co., 155 N.H. 314, 321 (2007) (quoting Pierson v. Hubbard, 147 N.H. 760, 763 (2002)). There are constitutional limits on the type of speech that may be the subject of state defamation actions. Riley v. Harr, 292 F.3d 282, 289 (1st Cir. 2002). A statement of opinion is not actionable, unless it may reasonably be understood to imply the existence of a defamatory fact as the basis for the opinion. Nash v. Keene Publishing Corp., 127 N.H. 214, 219 (1985); Pease v. Telegraph Publishing Co., 121 N.H. 62, 65 (1981); see also Milkovich v. Lorain Journal Co., 497 U.S. 1, 18 (1990) (rejecting a blanket constitutional protection for anything that might be labeled opinion, and excluding from protection those "opinions" that may imply a false assertion of fact).

Whether a statement can be read as being, or implying, an actionable statement of fact is a question of law to be determined by the trial court, considering the context of the publication as a whole. Nash, 127 N.H. at 219. If the average reader could reasonably understand a statement as actionably factual, there is an issue for a jury's determination. Id. However, "even a provably false statement is not actionable if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts." Riley, 292 F.2d at 289 (citations, internal quotations, and ellipses omitted). "[W]hen an author outlines the facts available to him, thus making it clear that the challenged statements represent his own interpretation of those facts and leaving the reader free to draw his own conclusions, those statements are generally protected by the First Amendment." Id. (citation omitted).

As to the letter to the editor of the Conway Daily Sun published on November 15, 2006 ("I searched diligently but in vain for any truthful statement in it" and "This person spews falsehoods and misrepresentations at a rate and in a quantity that should win him a place in the Guinness Book of World Records" and "Bourne's allegations about a fraudulent alteration of a certain map are delusional"), Mr. King's statements were non-actionable expressions of opinion.

3

It is clear that Mr. King is expressing merely his own opinion, and not a statement of fact, when he writes that Mr. Bourne's previously published statements were untruthful, that Mr. Bourne "spews falsehoods and misrepresentations", that he should be qualified for "the Guinness Book of World Records" and that he is "delusional." No reasonable reader would infer that Mr. King is stating a fact regarding, for example, falsehoods qualifying for the Guinness Book of World Records or Mr. Bourne's mental state. As in Pease, 121 N.H. at 65, which held that a reference to a reporter as "the journalistic scum of the earth" was no more than rhetorical hyperbole or a vigorous epithet, and not an assertion of fact, Mr. King's references here are non-actionable rhetorical hyperbole and vigorous epithet.[1]

As to the letter to the editor of the Conway Daily Sun published on February 25, 2008 (in which Mr. King writes that Mr. Bourne has made "tediously repetitive false accusations" and "[a]s the saying goes, repeating a lie endlessly will not make it the truth"), Mr. King's statements therein are similarly non-actionable opinion. Here, Mr. King was responding to letters written by Mr. Bourne in which he made what Mr. King considered to be false allegations. As Mr. King's letter was written in response to several letters by Mr. Bourne, Mr. King sufficiently laid out the facts upon which he was relying and left the reader free to draw his or her own conclusions. See Riley, 292 F.2d at 289; Pease, 121 N.H. at 65 ("The series of articles [relied upon by the defendant] was in the public domain, and anybody with sufficient interest could have reviewed it in order to determine whether they agreed with [Defendant's] opinion that the series constituted a smear campaign."). Similarly here, anyone with sufficient interest could have reviewed Mr. Bourne's published letters to determine whether he or she agreed with Mr. King. Accordingly, this letter was an expression of Mr. King's opinion of Mr. Bourne's letters, and not actionable.

As to message of October 19, 2006 to the editor of the Carroll County Independent and copied to members of the snowmobile club ("This is what a con man does"), Mr. King's statement is likewise non-actionable opinion. No reasonable reader could conclude that Mr. King was relying on undisclosed factual knowledge that Mr. Bourne is actually a "con man." Instead, he was again using rhetorical hyperbole and vigorous epithet. See Pease, 121 N.H. at

---

[1] That the use of this kind of rhetorical hyperbole and vigorous epithet does nothing to advance civil discourse is both generally true and apparent on the circumstances of this case, and the court's orders herein should not be misconstrued as endorsing their use.

65. This is a statement of opinion without an implied basis in fact, and cannot support a libel claim.

As to the email sent to members of the snowmobile club on November 6, 2003 ("Bourne is the nutcase who bought the camp on Solomon Harmon Road"), this statement is also a non-actionable statement of opinion. The use of a word like "nutcase" is, while ill-considered in even a spirited public debate, is a classic example of the kind of vigorous epithet which constitutes a statement of opinion, not an actionable statement of fact. Id.

In addition, Mr. Bourne's claim based on this November 6, 2003 statement is barred by the three-year statute of limitations provided by RSA 508:4 II.     RSA     508:4     II     (1997) provides, in pertinent part, "personal actions for slander or libel . . . may be brought only within 3 years of the time the cause of action accrued." Here, the cause of action accrued when Mr. King made the statement in 2003, and the defamation claim based on this statement was made more than three years later. Unlike other personal actions, defamation actions are not subject to the "discovery rule," RSA 508:4, I. The court concludes that this claim is not actionable because outside the limitations period provided by RSA 508:4 II.

For the foregoing reasons, the court determines that the four statements forming the basis of Mr. Bourne's remaining defamation claim against Mr. King are not actionable. Accordingly, Mr. King's motion to dismiss is granted.

So ordered.

February 5, 2010

Steven M. Houran
Presiding Justice

5